**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lisa Alfonso, | No. CV-21-01305-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Community Bridges Incorporated, | |
| Defendant. | |

Lisa Alfonso ("Plaintiff"), who is proceeding *pro se*, has sued her former employer, Community Bridges, Inc. ("CBI"), for violations of Title VII and the Americans with Disabilities Act ("ADA"). Now pending before the Court is CBI's motion for summary judgment. (Doc. 43.) For the following reasons, the motion is granted in part and denied in part. However, CBI is also granted leave to file a successive summary judgment motion as to Plaintiff's remaining claims.

## BACKGROUND

### I.    Preliminary Matters

In their motion papers, the parties present differing accounts of the events giving rise to Plaintiff's claims. The rule at summary judgment, of course, is that all legitimate disputes of fact must be resolved in Plaintiff's favor as the non-movant. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).

The analysis is complicated here, however, by the manner in which Plaintiff approached the summary judgment briefing process. Consistent with Rule 56(c)(1), CBI's

motion includes a statement of facts (Doc. 43 at 1-5) and is supported by a series of exhibits—which take the form of declarations, deposition transcripts, documents, and emails—offered to substantiate those factual assertions (Docs. 43-2 through 43-14). Unfortunately, in her response, Plaintiff does not clearly identify which of CBI's asserted facts are genuinely disputed.  Instead, Plaintiff offers a winding narrative of various events that occurred before, during, and after her employment at CBI.  (Doc. 44 at 2-7.)

An initial problem with this approach is that Plaintiff's summary judgment brief is not signed under penalty of perjury.  Neither is Plaintiff's complaint.[1]  Thus, at this stage of the case, the Court cannot simply accept, as true, the factual assertions appearing in either of those documents.  *See generally Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (clarifying that the rule requiring courts to "consider as evidence in his opposition to summary judgment all of [a *pro se* plaintiff's] contentions offered in motions and pleadings" only applies where, among other things, the plaintiff "attested under penalty of perjury that the contents of the motions or pleadings are true and correct").

In contrast, Plaintiff's EEOC charge, which she submitted as an exhibit to her complaint (Doc. 1 at 9-12), is signed under penalty of perjury.  Thus, the factual assertions appearing in that document—unlike the factual assertions appearing in the complaint and in Plaintiff's summary judgment brief—have evidentiary value at summary judgment. *Rodriguez-Severino v. UTC Aerospace Sys.*, 52 F.4th 448, 460-61 (1st Cir. 2022) ("Rodríguez-Severino also argues that the district court was obliged under Local Rule 56 to accept citations to allegations contained in his EEOC charges . . . [but] the district court stated that mere allegations are not evidence and cannot be used to defeat a summary judgment motion and ruled that Rodríguez-Severino needed to bring forth direct evidence of his claims.  Rodríguez-Severino is correct that he could choose to rely on his own unsworn statements made under penalty of perjury because this court will indeed recognize

---

[1]     During oral argument, Plaintiff clarified that the reason her complaint was not submitted under penalty of perjury is that she used the Court's pre-printed form.  While the Court appreciates the clarification, the bottom line is that the complaint was not signed under penalty of perjury.

such a statement in lieu of an affidavit in support of a motion for summary judgment.  And for good reason: The information set out in these statements would be direct evidence if Rodríguez-Severino had rewritten the information in the form of an affidavit and submitted the affidavit with his opposition to UTC's motion for summary judgment or, if this case went to trial, Rodríguez-Severino offered this information as direct testimony. . . .  As such, the district court should not have completely discounted these documents as part of Rodríguez-Severino's opposition to UTC's summary judgment motion . . . .") (internal citations omitted); *Yeomans v. Forster & Howell, Inc.*, 2010 WL 3716394, *4 (M.D. Ala. 2010) ("Yeomans also signed and dated the [EEOC] charging documents under the statement, 'I declare under penalty of perjury that the foregoing is true and correct.'  This satisfies the requirements of 28 U.S.C. § 1746.  The court concludes, therefore, that the charges sufficiently meet the requirements Rule 56(e), and the mere fact that the EEOC charge, and amended charge, are not in a traditional affidavit or declaration form is not sufficient reason to strike it from consideration at the summary judgment stage.").  As discussed in later portions of this order, this underscores the importance of carefully identifying the source of each factual assertion that Plaintiff offers in response to CBI's various summary judgment arguments—depending on the source, the assertion may or may not have evidentiary value.

Another problem posed by Plaintiff's approach is that although she occasionally indicates, in her summary judgment brief, that she disagrees with certain factual assertions by CBI (*see, e.g.*, Doc. 44 at 4 ["Contrary to Defendant's submission in there [sic] Exhibit 10[,] Ms. Walter did responded [sic] to Plaintiff's email . . . ."]), she does not address many of CBI's other factual assertions.  In a related vein, although Plaintiff attempts to substantiate some of her factual assertions by citing the exhibits appended to her response brief, many of the factual assertions appearing in Plaintiff's brief are unsupported statements bereft of citations to the record.  Given this backdrop, CBI argues that because "[t]he vast majority of Plaintiff's MSJ Response consists of unsupported, conclusory assertions that are not supported by specific citations to admissible evidence, whether in

the form of properly authenticated documents or sworn testimony," "this Court should consider all of the facts in Defendant's MSJ to be undisputed and, based on those undisputed facts, this Court should grant summary judgment in CBI's favor on all claims." (Doc. 47 at 2.)

CBI's request is overbroad.  Although Plaintiff repeatedly violated Rule 56(c), either by not properly controverting CBI's proffered facts or by failing to identify evidence in the record to support her version of the facts, she did comply with Rule 56(c) in some instances.  Accordingly, the Court cannot simply accept *all* of the facts in CBI's motion and grant summary judgment on that basis.  Instead, the Court may treat as undisputed only the subset of facts in CBI's motion that Plaintiff failed to properly controvert.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").  Similarly, the Court cannot ignore all of the factual assertions in Plaintiff's brief.  Instead, it must identify and credit the subset of the factual assertions that Plaintiff properly supported (or which the Court has otherwise determined are supported by Plaintiff's EEOC charge or other competent evidence in the record).  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").  The Court has followed this approach in Part II below, when summarizing the relevant facts.

Finally, CBI also objects to one of the exhibits that Plaintiff appended to her response brief.  As background, in its motion, CBI asserts that it began taking steps to eliminate Plaintiff's position (as part of a restructuring effort) in September 2020, which was before Plaintiff lodged her first complaint on October 1, 2020.  (Doc. 43 at 3-4, 11.) To support this assertion, CBI submits a declaration from Gabriella Guerra, CBI's former chief program officer.  (Doc. 43-12.)  In her response brief, Plaintiff disputes this point: "According to Ms. Guerra's declaration she stated that 'Plaintiff's duties were merged with another position in a different department.'  However, [o]n October 1, 2021 CBI posted a position for an Associate Director of Housing and Community Integration."  (Doc. 44 at

8.)  To substantiate this assertion, Plaintiff cites Exhibit 14 to her response, which is an email exchange between Plaintiff and CBI's counsel in which Plaintiff forwarded an October 1, 2021 job posting that appeared on Indeed.com.  (Doc. 44 at 54-56.)  In reply, CBI argues that this exhibit cannot be considered for summary judgment purposes because Plaintiff never properly disclosed it during the discovery process.  (Doc. 47 at 5.)[2]

CBI's argument on this point is unavailing.  Although Plaintiff may not have formally identified the Indeed.com job posting in any of her disclosure statements, CBI was obviously aware of it (and of Plaintiff's intent to rely on it) given the aforementioned email exchange, which occurred well before the close of discovery.  Thus, exclusion of the email is not warranted under Rule 37—any disclosure violation was harmless.

II.   Relevant Facts

With these clarifications in mind, the Court provides the following summary of the relevant facts.

In March 2020, CBI hired Plaintiff as an Associate Director of Housing and Community Integration.  (Doc. 1 at 11; Doc. 43-3 ¶ 6; Doc. 44 at 15-16.)  Plaintiff's direct supervisor was Elizabeth DaCosta.  (Doc. 43-6.)

Upon being hired, Plaintiff opted to enroll in short-term disability coverage.  (Doc. 43-3; Doc. 44 at 18.)  However, Plaintiff only made one premium payment before her coverage was cancelled.  (*Id.*)  The parties dispute why the coverage was cancelled—Plaintiff claims it was a clerical error on CBI's part (Doc. 44 at 2-3, 18, 33) while CBI contends that Plaintiff declined coverage during open enrollment (Doc. 43 at 2; Doc. 43-3 ¶¶ 8-10).  As discussed in later portions of the order, this dispute is not material for summary judgment purposes.

On October 1, 2020, Plaintiff emailed DaCosta about an event on September 30, 2020 that left Plaintiff "feeling very uncomfortable about the entire situation."  (Doc. 43-5

---

[2]    During oral argument, CBI sought to raise additional reasons why the exhibit lacks evidentiary value at summary judgment.  Those arguments are insufficiently developed on the current record but CBI may attempt to raise them in its successive summary judgment motion.

at 2.)  Specifically, Plaintiff complained that she had been excluded from part of a meeting in which one of her direct reports was terminated.  (*Id.*)  More broadly, Plaintiff criticized how CBI's leadership team had discussed other employees' terminations.  (*Id.* ["I still don't grasp the value of these comments."].)  Plaintiff went on to explain that she had "worked on overcoming many challenges with [her] team," including "accountability for lack of performance, programmatic concerns" with the terminated employee,[3] the creation of a "hostile work environment" (specifically, by the terminated employee, who yelled at Plaintiff), and "a perpetual pattern of gossip."  (*Id.*)  Plaintiff stated that, despite her hard work, she did not "feel that [she] [was] receiving equal treatment compared to those in similar situated positions."  (*Id.*)  However, the letter did not identify any of those "similar situated" coworkers, explain how they were being treated differently than her, or suggest that the differential treatment was due to her membership in any protected class.  (*Id.*)  Next, the letter stated: "If your comments were intended as suggestion for me to quit or threats of potential outcomes[,] I have done nothing wrong and will not be resigning from my position at CBI.  I do however feel that I am not being treated fairly/respectful in a work environment conducive to my maximum productivity potential."  (*Id.*.)  Finally, Plaintiff indicated that she would be filing a "formal complaint" and "taking a mental health day today and tomorrow and utilizing PTO" and would return to work on October 12, 2020 after a "previously approved vacation."  (*Id.* at 2-3.)

In a reply email, DaCosta stated that she had reached out to a CBI human resources representative, who would be providing Plaintiff "with a formal grievance form should [Plaintiff] chose [sic] to complete it."  (Doc. 43-6 at 2.)  DaCosta also included her "account of the event."  (*Id.* at 2-4.)  Broadly, DaCosta explained her rationale behind the termination

---

[3]     Plaintiff's summary judgment brief includes a narrative relating to this terminated employee, whose "negligence on the job led to the death of a resident and infant at the Center for Hope and ultimately the document complaints of October 1, 2020."  (Doc. 44 at 3,7, 9.)  The Court has chosen to omit the majority of the details related to this narrative for two reasons.  First, they were not disclosed in Plaintiff's EEOC charge.  (Doc. 1 at 9-12.)  Second, Plaintiff has not produced any admissible evidence to substantiate any of her claims related to the terminated employee, other than the fact that the employee was terminated.  (Doc. 44 at 20.)

of Plaintiff's subordinate (and others) and assured Plaintiff that "I cannot express enough how in no way were any parts of the conversation yesterday meant to make you feel as if you were underperforming or should resign.  I look forward to our continued work together, sharing our strengths to further develop our staff and department."  (*Id.*)  DaCosta also confirmed Plaintiff's plan to return to work on October 12, 2020.  (*Id.* at 4.)

On October 15, 2020, Plaintiff and DaCosta "went to lunch to address [Plaintiff's] complaint."  (Doc. 1 at 11.)  Plaintiff contends that, during the lunch, DaCosta asked "about a bracelet [Plaintiff] always wore."  (*Id.*)  Plaintiff contends that DaCosta "looked the bracelet up and found it was Santeria related and since [Plaintiff] was Cuban, she assumed that was true" despite Plaintiff clarifying that "it was actually a bracelet of IFA, not Santeria" and further explaining that "IFA is something you are born into, but that [Plaintiff] belonged to the church of Spiritualism and was working on her credentials as a medium."  (*Id.*)

According to Plaintiff, over the following two weeks, DaCosta, who is Christian, "hardly spoke" to Plaintiff, "refused to be in the same room" as Plaintiff, switched Plaintiff's work schedule from one day a week work from home to two days a week, and then Plaintiff's "work cell phone was hacked.  Apps were moved and replaced and all of her text messages from [DaCosta] and [Plaintiff's] counterpart were deleted."  (*Id.*)  Plaintiff "believed these actions were retaliation for reporting [DaCosta's] discrimination in the October 1st complaint."  (*Id.*)  Plaintiff also contends that DaCosta made comments to the effect of "[Plaintiff] should go out on a long extended leave or vacation" and "if [Plaintiff] was smart [she] could look out to the landscape and see that [another employee] was next in line to be the Associate Director."  (*Id.*)  Plaintiff contends that this conduct caused her to suffer "extreme emotional distress leading to an urgent care visit, multiple ER visits, and now [Plaintiff] currently sees seven different specialists for treatment." (*Id.*)

On November 5, 2020, Plaintiff forwarded a copy of her October 1, 2020 email to Teresa Steege, CBI's human resources manager.  (Doc. 44 at 20.)  Plaintiff also relayed the allegations of her phone being hacked.  (*Id.* at 22.)  Additionally, Plaintiff identified,

by name, the coworker who was experiencing the "same favoritism that I discussed in my initial complaint" and ascribed the favoritism to the "personal bond" between DaCosta and this coworker.  (*Id.* at 23.)  However, Plaintiff again did not elaborate on how this coworker was being treated more favorably than her and did not suggest that the differential treatment was due to her membership in a protected class.[4]  Plaintiff then described additional incidents, including that DaCosta had made comments that other employees would be considered over Plaintiff for promotions, and that Plaintiff receives a disproportionate share of on-call communications.  (*Id.* at 23-25 ["It's very apparent that Ms. DaCosta wants me to quit my job as I am being excluded from hiring interviews, decision making, I don't get any new assignments and can't even manage my own programs, she's directed employees to only notify her, contrary to what she writes in emails in person she mocks me."].)  Plaintiff concluded by explaining that "I have spent two days in ER for high blood pressure and pre-stroke symptoms, multiple doctors appointments due to the stressors from work" and "[s]ince I was not provided with the correct CBI formal grievance form by Melissa[, p]lease accept this as my formal grievance, I will sign any paperwork I have to upon my return to work."  (*Id.* at 24-25.)

On November 10, 2020, CBI approved Plaintiff for a medical leave of absence ("MLOA") retroactive from November 3, 2020 through December 3, 2020.  (Doc. 43-7.)  CBI informed Plaintiff that it would be an "unpaid leave of absence and may be granted for up to 30 days."  (*Id.*)  Further, Plaintiff was informed that "MLOA is not a job protected leave."  (*Id.*)

---

[4]      In her charge of the discrimination to the EEOC, which was filed in March 2021, Plaintiff again stated that this coworker was being "constantly treated . . . much more favorably" than her and also stated that the coworker is "a white female," whereas she is "Cuban."  (Doc. 1 at 9.)  However, Plaintiff again failed to provide any specifics about how the coworker was being treated more favorably.  In her summary judgment response, Plaintiff belatedly attempts to provide these details, asserting that DaCosta and the coworker were close friends, which led to DaCosta helping the coworker with personal issues at work, including using work software to run a background check on one of the coworker's acquaintances.  (Doc. 44 at 3.)  These details are not properly before the Court at summary judgment because there is no cognizable *evidence* of them—as discussed elsewhere, unsupported factual assertions in a summary judgment brief are insufficient under Rule 56(c).

On November 17, 2020, Plaintiff informed Da Costa and Melissa Metcalf, CBI's human resources generalist, that she could return to work on November 25, 2020. (Doc. 44 at 32.) Plaintiff also provided a doctor's note stating that her absence was due to an "illness or injury" lasting from November 10, 2020 to November 24, 2020. (*Id.*)

On November 24, 2020, DaCosta responded that she was "glad to hear things have improved" and that Plaintiff should report to "Cactus tomorrow. We will have you continue to focus on CCHP[5] for the remainder of this week." (*Id.*) Later that day, Plaintiff emailed Steege to report that she had suffered a "TIA/mini-stroke" three weeks earlier. (*Id.* at 33; Doc. 1 at 10.) Plaintiff also reported to Steege that she construed DaCosta's request to report to a new location (Cactus instead of Heritage) as encouraging her to quit and part of a continued pattern of harassment. (Doc. 44 at 33.) Plaintiff continued: "I do not think that I can accommodate [DaCosta's] request and I will be asking my doctor to re-evaluate my return to work based on this new information tomorrow." (*Id.*)[6]

On November 25, 2020, Metcalf reached out to Plaintiff: "We are aware that you may need a reasonable accommodation when coming back to work. Can you please fill out the Application for Reasonable Accommodation being specific on what you need as an accommodation? Please have your physician fill out the medical inquiry form for a reasonable accommodation as well." (Doc. 44 at 36.) Plaintiff did not immediately respond.

On December 2, 2020, and again on December 10, 2020, Metcalf followed up by email to ask Plaintiff to fill out the reasonable accommodation form. (Doc. 44 at 35 ["We have not heard back from you in regards to any accommodation that you may need when you come back to work on 12/16/2020. Is the accommodation(s) still needed?"].)

On December 11, 2020, Plaintiff was approved for a personal leave of absence ("PLOA") retroactive to December 4, 2020 through February 2, 2021. (Doc. 43-8.) Again,

---

[5] CCHP is one of the CBI programs that Plaintiff oversaw. (Doc. 44 at 22.)

[6] Plaintiff also informed Steege that she would "seek legal assistance in terms of my rights in Arizona and my benefits being cancelled without my consent as I need [to] utilize this resource." (Doc. 44 at 33.)

Plaintiff was informed that "PLOA is not a job protected leave."  (*Id.*)

On January 11, 2021, Plaintiff filled out the "Application for Reasonable Accommodation."  (Doc. 44 at 38-40; Doc. 1 at 10 [explaining that she submitted the application to CBI].)[7]  In response to the prompt regarding how to modify her "job duties or work environment," Plaintiff wrote: "I am currently under the care of several specialist[s] with my PCP as coordinator.  At this time my PCP does not release me to return to work." (*Id.* at 38.)  When asked to "[d]escribe the essential functions of your job that you are unable to perform based upon your disability," Plaintiff wrote "unknown at this time." (*Id.* at 39.)  When asked to detail the "[n]ature of your disability (include[] or attach any information that will help us understand the nature of your disability and the limits it places upon your ability to perform the essential functions of your current job)," Plaintiff wrote: "diagnosis in process (cardiovascular disease, diabetes, CNS disease, fatty liver & IBS)." (*Id.*)  Plaintiff also declined to grant CBI access to her medical records. (*Id.*)  Finally, when asked to indicate the duration of the reasonable accommodation, Plaintiff wrote "unknown." (*Id.* at 40.)

On February 2, 2021, Plaintiff informed CBI that she would return to work on February 3, 2021. (Doc. 1 at 10.)  In response, CBI informed Plaintiff that her position had been eliminated.  (*Id.*; Doc. 44 at 47.)   During a call with CBI's human resources department, there was no discussion of Plaintiff's grievance. (Doc. 1 at 10.)  CBI offered Plaintiff an alternative job in an "Access to Care" position. (Doc. 44 at 47.)  According to CBI's official job description, this job is generally suited for people currently in recovery and only requires a high school diploma or GED.  (*Id.* at 44-45.)  Plaintiff declined the position.  (*Id.* at 49.)[8]

In April 2021, the Arizona Department of Economic Security denied Plaintiff's application for unemployment benefits because she "did not provide proper notice to [her]

---

[7]     CBI contends that "Plaintiff never disclosed the nature of her purported disability to CBI at any time during her employment."  (Doc. 47 at 3.)  However, CBI does not specifically dispute that it received this accommodation form.

[8]     On February 25, 2021, CBI offered Plaintiff "2 weeks severance."  (Doc. 44 at 51.)

employer of [her] absence from work."[9]  (Doc. 44 at 53.)

CBI contends that the elimination of Plaintiff's position was the result of a business restructuring, under the direction of new executive leadership, that began no later than September 2020 (*i.e.*, before Plaintiff ever complained about DaCosta or her work environment).  (Doc. 43-12 ¶ 7 ["The restructuring process for the CI&H Department began no later than September of 2020, before Plaintiff ever complained to CBI about any alleged violations under Title VII or the Americans With Disabilities Act."]; *id.* ¶ 4 ["CBI did not assign or hire anyone to fill Plaintiffs position.  Rather, CBI merged Plaintiffs [sic] duties into another position in a different department at CBI with someone who already had oversight over Medicaid-funded programs."]; Doc. 43-13 [November 2, 2020 email with subject line of "Leadership Transition"].)  However, on October 1, 2021, Plaintiff received an email indicating that CBI was soliciting applicants for the position of "Associate Director of Housing & Community Integration," which is Plaintiff's former job title.  (Doc. 44 at 55-56.)

III.   Procedural History

On March 3, 2021, Plaintiff filed a charge of discrimination with the EEOC, checking boxes to indicate that she had suffered discrimination on the basis of national origin, retaliation, and disability.  (Doc. 1 at 9-12.)  Plaintiff did not, in contrast, check the boxes indicating that she had suffered discrimination on the basis of race, color, sex, religion, age, genetic information, or on any other basis.  (*Id.* at 9.)

On May 5, 2021, the EEOC issued Plaintiff a "Notice of Right to Sue."  (*Id.* at 14.)

On July 28, 2021, Plaintiff initiated this action by filing the complaint, which included both the EEOC charge and the right-to-sue letter as attachments.  (Doc. 1.)  In her complaint, using the pre-printed check boxes, Plaintiff identified her claims as falling under Title VII and the ADA.  (*Id.* at 3.)  Using other pre-printed checkboxes, Plaintiff alleged three categories of discriminatory conduct: termination, failure to accommodate her

---

[9]     In her response brief, Plaintiff asserts (without providing supporting evidence) that she successfully appealed her denial of unemployment benefits and was "awarded 14 weeks of unemployment benefits at a rate of $240 per week."  (Doc. 44 at 6.)

disability, and retaliation.  (*Id.* at 4.)  Using still other pre-printed checkboxes, Plaintiff alleged that CBI had discriminated against her based on her race, religion, national origin, and disability.  (*Id.*)

On November 21, 2022, CBI filed its motion for summary judgment.  (Doc. 43.) That motion is now fully briefed.  (Docs. 44, 47.)

On July 7, 2023, the Court issued a tentative decision.  (Doc. 57.)

On August 1, 2023, the Court heard oral argument.  (Doc. 58.)

## LEGAL STANDARD

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors,* 771 F.3d at 1125.  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's favor."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts."  *Fresno Motors*, 771 F.3d at 1125.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

Although Plaintiff is *pro se*, "litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record." *Jacobsen v. Filler*, 790 F.2d 1362, 1364-65 (9th Cir. 1986). "The Ninth Circuit directs courts 'to make reasonable allowances for pro se litigants and to read pro se papers liberally.'" *Wilson v. JPMorgan Chase, N.A.*, 2020 WL 6262106, *2 (W.D. Wash. 2020) (quoting *McCabe v. Arave*, 827 F.2d 634, 640 n.6 (9th Cir. 1987)). However, "district courts lack 'the power to act as a party's lawyer, even for pro se litigants.'" *Id.* (quoting *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007)). *See also Bias*, 508 F.3d at 1219 ("[Plaintiff] maintains . . . that as a *pro se* litigant the district court should have searched the entire record to discover whether there was any evidence that supports her claims. We disagree. A district court does not have a duty to search for evidence that would create a factual dispute.").

## DISCUSSION

Evaluating CBI's entitlement to summary judgment is a complicated task. Many of the purported facts referenced in Plaintiff's summary judgment brief are not properly supported, as required by Rule 56(c). Additionally, Plaintiff's theories of liability are not always clear—she checked boxes in her EEOC complaint form indicating that she had

1    suffered certain forms of discrimination, then checked different boxes in her complaint in

2    this case, and now advances an often unsupported factual narrative in her summary

3    judgment brief that is not always tethered to her EEOC charge form or her complaint.

4    Understandably, then, CBI's motion for summary judgment has a bit of a shotgun feel—

5    CBI does its best to understand Plaintiff's theories of liability and explain why those

6    theories should not survive summary judgment.  The merits of CBI's arguments, and

7    Plaintiff's responses to them, are addressed below.

8    I.    Administrative Exhaustion

9    As an initial matter, CBI argues that the Court lacks jurisdiction over some of

10   Plaintiff's claims and theories of liability due to a lack of administrative exhaustion.  (Doc.

11   43 at 4-5, 7.)  More specifically, CBI argues that Plaintiff may not raise, in this action, any

12   claims for race or religious discrimination under Title VII or any hostile work environment

13   claim because she did not assert such claims in her EEOC charge.  (*Id.*)  In response,

14   Plaintiff argues that her "EEOC supporting facts [do] include claims based on race and

15   religion."  (Doc. 44 at 6.)

16   "In order to establish subject matter jurisdiction over her Title VII claim, Plaintiff

17   was required to exhaust her administrative remedies.  Under Title VII, a plaintiff must

18   exhaust her administrative remedies by filing a timely charge with the EEOC . . . , thereby

19   affording the agency an opportunity to investigate the charge."  *B.K.B. v. Maui Police

20   Dept.*, 276 F.3d 1091, 1099 (9th Cir. 2002).  "The jurisdictional scope of a Title VII

21   claimant's court action depends upon the scope of both the EEOC charge and the EEOC

22   investigation."  *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990).  "Incidents of

23   discrimination not included in an EEOC charge may not be considered by a federal court

24   unless the new claims are 'like or reasonably related to the allegations contained in the

25   EEOC charge.'"  *Green v. L.A. Cnty. Superintendent of Sch.*, 883 F.2d 1472, 1475-76 (9th

26   Cir. 1989) (citation omitted).  "In reviewing the jurisdictional question, we are required

27   under Ninth Circuit law to construe [Plaintiff's] EEOC charge with the utmost liberality."

28   *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994) (cleaned up).

A.   **Race**

Plaintiff's EEOC charge includes the following two sentences: "While working under [DaCosta], Ms. Alfonso was subjected to disparate treatment.   Specifically, [DaCosta] constantly treated [one of Plaintiff's coworkers], who is a white female, much more favorably than Ms. Alfonso, who is Cuban."  (Doc. 1 at 9.)  As noted, Plaintiff also used the pre-printed check boxes on the EEOC charge form to indicate that she had suffered three forms of discrimination: national origin, retaliation, and disability.  (*Id.*)  Plaintiff did not check the boxes for "race" or "color" discrimination.  (*Id.*)  Additionally, in the introductory paragraph of the narrative section of the charge, Plaintiff wrote that she "has been the victim of national origin discrimination in violation of Title VII" but made no mention of racial discrimination.  (*Id.*)

The Ninth Circuit has held that discrimination based on race and national origin are not interchangeable.  *Shah v. Mt. Zion Hosp. & Med. Ctr.*, 642 F.2d 268, 272 (9th Cir. 1981) ("Prior to instituting suit, Shah filed an EEOC complaint alleging sex and national origin discrimination.  At trial Shah attempted to expand his Title VII action to include race, color and religious discrimination.  The district court lacked subject matter jurisdiction over these additional claims because Shah failed to raise them before the EEOC.").  Here, although Plaintiff's EEOC charge noted that she was Cuban and that a white coworker was receiving unspecified forms of preferential treatment, there were no factual allegations suggesting Plaintiff's *race* was at issue.  Indeed, Plaintiff did not identify herself as non-white.  *Cf. Benitez v. Tyson Fresh Meats, Inc.*, 2022 WL 1283087, *47 & n.94 (M.D. Tenn. 2022) ("[M]any Cubans undeniably are Caucasian (or white).") (citation omitted); *De La Torres v. Gianni Furniture Co.*, 1986 WL 6407, *2 (N.D. Ill. 1986) ("[P]laintiff's status as a Cuban-American, in itself, does not provide him with membership in a non-white racial group.  Plaintiff alleges only that he comes from Cuba.  This is his national origin, not his race.").  Even construed with the utmost liberality, Plaintiff's EEOC charge was insufficient to exhaust any claim of race discrimination under Title VII. *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002) ("The inquiry

into whether a claim has been sufficiently exhausted must focus on the factual allegations made in the charge itself, describing the discriminatory conduct about which a plaintiff is grieving.").

### B.   Religion

Although Plaintiff did not mark the "religion" box on her EEOC charge form, she did describe, in the narrative section, the encounter with DaCosta on October 15, 2020 concerning her bracelet and identification as part of the IFA faith.  (Doc. 1 at 11.)  Plaintiff also alleged that, immediately after this incident, DaCosta "hardly spoke with [her]," changed her work hours, and apparently hacked her cell phone.  (*Id.*)

Given the specificity of the conduct described in the narrative section of the EEOC charge form (including the date, the offending party, and the consequences), Plaintiff's allegations were sufficient to put the EEOC on notice of Plaintiff's claim of religious discrimination.  *Freeman*, 291 F.3d at 637.  It is not dispositive that Plaintiff failed to check the "religion" box on the form.  *See generally Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 644 (9th Cir. 2003) ("Because Vasquez's EEOC charge only claimed harassment and different treatment, we must decide whether his current retaliation claim is reasonably related to the EEOC charge.  In doing so, we may consider 'such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred.'") (citation omitted); *Norton v. PHC-Elko, Inc.*, 46 F. Supp. 3d 1079, 1090 (D. Nev. 2014) ("Even if Plaintiff's Charge form did not include a checked 'Retaliation' box, charges filed before the EEOC are construed liberally.  A court should look not just to a checked box, but also to allegations of discrimination 'which can reasonably be expected to grow out of a charge of discrimination.'") (citations omitted).

### C.   Hostile Work Environment

Liberally construed, Plaintiff's EEOC charge form was also sufficient to exhaust a hostile work environment claim.  The charge included allegations that DaCosta "refused to be in the same room" as Plaintiff, made comments about Plaintiff going on "a long

extended leave or vacation," and made comments about how Plaintiff would likely be passed over for a promotion. (Doc. 1 at 11.) The charge form also asserted that Plaintiff notified DaCosta of her "medical condition resulting from the hostile work environment." (*Id.*) Additionally, the charge form described DaCosta's repeated attempts to force Plaintiff to resign through words and to ignore Plaintiff's presence. (*Id.* at 10-11.) Thus, as least as to these factual allegations, Plaintiff did enough to achieve administrative exhaustion. *Freeman*, 291 F.3d at 637.

In contrast, although Plaintiff's summary judgment brief contains an extensive discussion of the conduct of one of Plaintiff's since-terminated subordinates (which Plaintiff characterizes as creating a hostile work environment), Plaintiff did not administratively exhaust any claim related to that conduct. This is because Plaintiff's EEOC charge does not reference the subordinate at all and omits any discussion of verbal or physical threats by that employee. (*See generally* Doc. 1 at 9-12.) Thus, the EEOC would have had no occasion to investigate those allegations.

II.    Discrimination Theories

Although Plaintiff's Title VII claim for race discrimination must be dismissed for the reasons stated in Part I above, Plaintiff's complaint indicates that she is also asserting claims for discrimination based on her religion, national origin, and disability. (Doc. 1 at 4.)

The first two claims are governed by Title VII, which "makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986) (quoting 42 U.S.C. § 2000e-2(a)(1)). In that Ninth Circuit, Title VII claims are analyzed via the *McDonnell Douglas* burden-shifting framework. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010). Under that framework:

> [P]laintiffs must first establish a prima facie case of employment discrimination. If plaintiffs establish a prima facie case, [t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. If defendant

meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant's proffered reasons . . . are mere pretext for unlawful discrimination.

*Id.* (alteration in original) (citations and internal quotation marks omitted).

To establish a *prima facie* case of employment discrimination under Title VII based on circumstantial evidence, plaintiffs must show: "(1) that they are members of a protected class; (2) that they were qualified for their positions and performing their jobs satisfactorily; (3) that they experienced adverse employment actions; and (4) that similarly situated individuals outside [their] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Id.* at 1156 (alteration in original) (internal quotation marks omitted). "In the context of employment discrimination law under Title VII, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's [protected characteristic]." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

Plaintiff's final claim, for disability discrimination in violation of the ADA, requires a bit more discussion. Although CBI characterizes this claim as solely for "failure to accommodate a disability" (Doc. 43 at 4-5), Plaintiff's EEOC charge, complaint, and summary judgment brief all suggest—albeit with less than ideal clarity—that she is alleging both that she was terminated as a result of her disability and that CBI failed to accommodate her disability. (Doc. 1 at 4, 9-10; Doc. 44 at 3-4.) These are potentially distinct theories of liability. *Johnson v. Bd. of Trustees of Boundary Cnty. Sch. Dist. No. 101*, 666 F.3d 561, 567 (9th Cir. 2011) ("[T]he basis for Johnson's discrimination claim is the Board's failure to accommodate her disability, which is analytically distinct from a claim of disparate treatment or impact under the ADA."). *See also Dunlap v. Liberty Natural Prods., Inc.*, 878 F.3d 794, 798 (9th Cir. 2017) ("[T]he district court's conflation of the elements of Dunlap's disparate treatment and failure-to-accommodate claims constituted instructional error as a misstatement of the law.").

More specifically, "to prevail on an employment termination claim under the ADA, a plaintiff must establish: (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability." *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (quoting *White v. York Int'l Corp.*, 45 F.3d 357, 360-61 (10th Cir. 1995)). In this context, it is not enough to show "that a disability was a motivating factor of the adverse employment action." *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019). Instead, "ADA discrimination claims under Title I must be evaluated under a but-for causation standard." *Id.* at 1107. *See also Whaley v. Bonded Logic Inc.*, 2020 WL 5593882, *3 (D. Ariz. 2020) (granting summary judgment in the employer's favor where the employee failed "to show facts that the termination would not have occurred in the absence of the alleged discrimination by his former employer")

Separately, the ADA also "defines discrimination to include an employer's failure to make a reasonable accommodation." *Dunlap*, 878 F.3d at 799 (cleaned up). Thus, an employer violates the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of" the employer. 42 U.S.C. § 12112(b)(5)(A). *See generally Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) ("The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business.").

A.   **ADA Claims**

1.   Termination

With these clarifications in mind, the Court first considers Plaintiff's claim that she was terminated in violation of the ADA. CBI seems to seek summary judgment on this

claim for four reasons.  First, CBI argues that "Plaintiff failed to disclose her alleged disability to CBI, making it impossible for CBI to know how to accommodate Plaintiff." (Doc. 43 at 7.)  Second, CBI argues that "Plaintiff admitted in her deposition that she never had a disability in the first place."  (*Id.*)  Third, CBI argues that "Plaintiff cannot show that Ms. DaCosta's alleged behavior rose to the level of an adverse employment action."  (*Id.* at 6).  Fourth, CBI argues that "there is no evidence that CBI treated other similarly situated employees more favorably than Plaintiff" and that "Plaintiff merely alleges that Ms. DaCosta was nicer to a white co-worker, but Plaintiff has not disclosed any evidence that Ms. DaCosta's alleged favoritism was motivated by . . . disability."  (*Id.*)  In response, Plaintiff generally argues that the elimination of her position and CBI's offer of a lesser position were "due to her perceived physical and/or mental impairment."  (Doc. 44 at 5, 7.) In reply, CBI argues: "At most, Plaintiff only alleges that CBI lawfully requested information about her purported disability in an effort to fulfill its mandatory legal duty to engage in an interactive process to determine whether it could reasonably accommodate Plaintiff's alleged disability, even though Plaintiff admitted in her deposition that she never had a disability in the first place."  (Doc. 47 at 4.)

### a.  **Existence And Disclosure Of Disability**

CBI is not entitled to summary judgment based on its argument that Plaintiff admitted, during her deposition, that she did not have a disability while working for CBI. First, the ADA prohibits discrimination not only based on *actual* disability but also based on *perceived* disability.  *EEOC v. BNSF Railway Co.*, 902 F.3d 916, 922 (9th Cir. 2018) ("Under the ADA, a person with a 'disability' is defined to include an individual who is 'regarded as having' an impairment."); *Deppe v. United Airlines*, 217 F.3d 1262, 1265 (9th Cir. 2000) ("In 'regarded as' cases, the employer must perceive the individual as having an actual disability under the ADA.").  Thus, even if Plaintiff admitted to not being actually disabled during her tenure at CBI—and as discussed below, a rational juror could find that she did not—such an admission would not, on its own, compel the entry of summary judgment in CBI's favor.

- 20 -

Second, as for the purported admission, although Plaintiff's responsive arguments on this point are unhelpful—her only seeming response is to explain that she "do[es] not have the transcript [and] has never seen, read nor signed the deposition" (Doc. 44 at 3)— the Court's independent review of the record shows that CBI has placed its own spin on Plaintiff's deposition testimony.  Plaintiff testified that her disability "occurred after I left [CBI].  I never went back.  So there was no discussion with anybody regarding my disability." (Doc. 43-4 at 3.)  But Plaintiff went on to provide the caveat that, in her view, she never went back to work after "October 31st" so "nobody would have known about any disability that happened with me or anything that happened with me, because I didn't have contact with anybody." (*Id.*)  Given that Plaintiff remained employed with CBI until February 2021, a rational juror could construe Plaintiff's description of the timing of her disability onset—"after I left" CBI—as a reference to when she went on medical leave in the fall of 2020, not when she left CBI's employment in February 2021.  This interpretation is supported by evidence submitted by Plaintiff in response to CBI's summary judgment motion, including evidence that Plaintiff formally submitted a reasonable accommodation request in January 2021 indicating that her "diagnosis in progress" included "cardiovascular disease, diabetes, CNS disease, fatty liver & IBS." (Doc. 44 at 38-39.)  This evidence also undermines CBI's argument that Plaintiff "failed to provide CBI with any information about the nature of any purported disability." (Doc. 47 at 7.)

### b.     **Adverse Employment Action**

CBI next argues that "Plaintiff cannot show that Ms. DaCosta's alleged behavior rose to the level of an adverse employment action concerning the 'compensation, terms, conditions, or privileges of employment.'" (Doc. 43 at 6, citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).)  CBI also argues it has met its burden for the affirmative defense outlined in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), by employing procedures to prevent discrimination (which Plaintiff did not avail herself of). (*Id.* at 6-7.)  In response, Plaintiff argues that CBI failed "to return Plaintiff to her previous or similar suited position

with CBI" after her short-term disability leave.  (Doc. 44 at 8.)[10]  In reply, CBI reiterates that Plaintiff cannot show an adverse employment action and that it is shielded by the *Faragher* defense.  (Doc. 47 at 9.)

Reserving judgment on the affirmative defense, Plaintiff has proffered sufficient evidence of an adverse employment action.  "An adverse employment action is one that materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (alterations in original) (internal quotation marks omitted).  CBI's elimination of Plaintiff's position and offer of a less desirable replacement position (which Plaintiff chose to reject due to its undesirability) qualifies as an adverse action.  *Cf. Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 660 (9th Cir. 2002) ("[B]eing laid off from one's position certainly constitutes an adverse employment action."); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002) ("And certainly, Harvest has suffered an adverse employment action: Aloha terminated him."); *Marquez v. Glendale Union High Sch. Dist.*, 2018 WL 4899603, *17 (D. Ariz. 2018) ("Discharging an individual because of a disability or failing to accommodate an individual's known disability constitute adverse employment actions.").

In contrast, DaCosta's alleged rude behavior toward Plaintiff, including insults or suggestions that Plaintiff should quit, are not adverse employment actions.  *See, e.g.*, *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'").  Even the most generous interpretation of Plaintiff's evidence suggests that DaCosta made these comments only a handful of times.

…

---

[10]   Plaintiff also alleges that CBI cancelled her short-term disability benefits.  (Doc 44 at 7.)  However, it is undisputed that the cancellation occurred before any disclosure related to Plaintiff's disability.  (Doc. 43-3 ¶¶ 6-7 ["The foregoing payment was withdrawn on May 1, 2020, shortly after Plaintiff began her employment.  CBI did not withdraw any other payments for short-term disability after May 1, 2020."].)  Additionally, Plaintiff herself contends that the cancellation was the result of an inadvertent error, not intentional discrimination.  (Doc. 1 at 8 ¶ 23.)

### c.    **CBI's Other Arguments**

CBI's final argument is that "there is no evidence that CBI treated other similarly situated employees more favorably than Plaintiff" and that "Plaintiff merely alleges that Ms. DaCosta was nicer to a white co-worker, but Plaintiff has not disclosed any evidence that Ms. DaCosta's alleged favoritism was motivated by . . . disability." (Doc. 43 at 6.)  As an initial matter, to the extent Plaintiff's theory of ADA liability is that she was effectively fired because of her perceived disability, there is no need for Plaintiff to identify a similarly situated non-disabled employee who was treated differently.  *Kennedy*, 90 F.3d at 1481 (identifying the elements of "an employment termination claim under the ADA," which simply requires proof "that the employer terminated [the plaintiff] because of his disability").

As for whether the decision to eliminate Plaintiff's position—and, thus, effectively terminate Plaintiff—was motivated by Plaintiff's perceived disability, the Court construes Plaintiff's brief as arguing that such motivation may be inferred from the temporal proximity between her disclosures regarding her medical conditions and her termination. *Cf. Anderson v. City & Cnty. of San Francisco*, 169 F. Supp. 3d 995, 1035 (N.D. Cal. 2016) ("Plaintiff is silent on the issue of causation.  The court will construe Plaintiff's causation evidence as being based solely on temporal proximity between the filing of her second EEOC charge in March 2012, and her non-selection for the 115th Fire Academy in July 2013.").  A reasonable juror could conclude that Plaintiff disclosed her purported disability in January 2021, when she submitted her reasonable accommodation request, and was terminated in February 2021 and could then infer a causal connection between the two events based on their temporal proximity.  *Id.* at 1027 ("Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision.").  *See also Villiarimo*, 281 F.3d at 1065 ("We have recognized previously that, in some cases, causation can be inferred from timing alone where an adverse employment

action follows on the heels of protected activity.").

During oral argument, CBI attempted to dispute these conclusions by arguing that Plaintiff's disclosure of her purported disability actually occurred in October or November 2020 and that the resulting delay between the disclosure and adverse action was too long to raise a causal inference. This argument is unpersuasive for two reasons. First, the relevant chronology is that Plaintiff indicated on November 17, 2020 that she would be able to return to work on November 25, 2020. (Doc. 44 at 32.) However, on November 24, 2020, after being told that her work location would change, Plaintiff stated that "I do not think that I can accommodate [the changed location] request and I will be asking my doctor to re-evaluate my return to work based on this new information tomorrow." (*Id.* at 33.) The following day, on November 25, 2022, Metcalf sent the following email to Plaintiff: "We are aware that you may need a reasonable accommodation when coming back to work. Can you please fill out the Application for Reasonable Accommodation being specific on what you need as an accommodation? Please have your physician fill out the medical inquiry form for a reasonable accommodation as well. Once these are filled out, you can send them back to me and we will review your request." (*Id.* at 35.) After Plaintiff did not respond, Metcalf followed up several times in November 2020 and December 2020, ultimately explaining that she was inquiring about an accommodation in anticipation of Plaintiff's return on December 16, 2020. (*Id.*) Plaintiff did not respond to Metcalf's requests for information until January 11, 2021, when she formally submitted a reasonable accommodation request. (*Id.* at 38-40.) A reasonable juror could infer from this chronology that the Plaintiff's email of November 17, 2020 indicated that she was no longer disabled; that Plaintiff's email of November 24, 2020, although ambiguous due to its reference to "asking [Plaintiff's] doctor to re-evaluate [her] return to work," did not constitute a renewed claim of disability but rather reflected Plaintiff's dissatisfaction with the plan to change her work location; and that Plaintiff did not effectively reassert a disability until January 11, 2021, when she formally submitted the reasonable accommodation request.

Alternatively, even assuming that Plaintiff reasserted her disability to CBI on November 24, 2020, a rational juror could still make a causal inference due to the temporal proximity between that date and the timing of the adverse employment action in early February 2021. *See, e.g.*, *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ("The first series of transfers of job duties between August 1979 and February 1980 began less than three months after he filed his first administrative complaint. . . . Thus, Yartzoff set forth sufficient evidence on which to establish a prima facie case on these claims.").

Finally, as for CBI's contention that Plaintiff's October 1, 2020 email to DaCosta could not have imparted notice that Plaintiff was claiming any kind of disability, the Court agrees. Nevertheless, as explained, viewing the facts in the light most favorable to Plaintiff, it was the January 2021 request for a reasonable accommodation (or, perhaps, the November 24, 2020 email) that renewed CBI's perception of Plaintiff as disabled.

### d.  **Non-Discriminatory Explanation**

Because Plaintiff has met her *prima facie* burden, the burden shifts to CBI "to articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn*, 615 F.3d at 1155 (citation omitted). *See also Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) ("Discrimination and retaliation claims under the ADA are both subject to the burden-shifting framework outlined in [*McDonnell Douglas*].").

CBI has met its burden of production. CBI contends that a business restructuring was already underway before Plaintiff sent her October 1, 2020 email or made any of the other relevant disclosures. (Doc. 43 at 5.) To support this argument, CBI offers evidence that "[t]he restructuring process for the CI&H Department began no later than September of 2020, before Plaintiff ever complained to CBI about any alleged violations under Title VII or the American With Disabilities Act." (Doc. 43-12 ¶ 7; Doc. 43-13 at 2 [November 2020 email titled "Leadership Transition"]; Doc. 43-14 [December 2020 email titled "Upcoming Transition"].)

…

…

e.    **Pretext**

Accordingly, the burden shifts back to Plaintiff to "introduce evidence sufficient to raise a genuine issue of material fact as to whether the reasons [CBI] articulated are pretexts" for disability discrimination.  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000).  "A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence. . . .  Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer.  Circumstantial evidence, in contrast, is evidence that requires an additional inferential step to demonstrate discrimination.  It can take two forms.  First, the plaintiff can make an affirmative case that the employer is biased.  For example, statistical evidence is circumstantial evidence that could, if sufficiently probative, point to bias.  Second, the plaintiff can make his case negatively, by showing that the employer's proffered explanation for the adverse action is 'unworthy of credence.'"  *Coghlan v. American Seafoods Co. LLC*, 413 F.3d 1090, 1094-95 (9th Cir. 2005).  "The distinction between direct and circumstantial evidence is crucial, because it controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment.  Because direct evidence is so probative, the plaintiff need offer 'very little' direct evidence to raise a genuine issue of material fact.  But when the plaintiff relies on circumstantial evidence, that evidence must be 'specific and substantial' to defeat the employer's motion for summary judgment."  *Id.* (citations omitted).

Viewing the evidence in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to whether CBI's proffered reason for terminating Plaintiff (*i.e.*, her position was eliminated as part of a business restructuring) is pretextual.  First, even though CBI approved both of Plaintiff's leaves of absence during her term of employment (Docs. 43-7, 43-8), CBI subsequently opposed Plaintiff's application for unemployment benefits on the ground that Plaintiff did "not provide proper notice" of her "absence from work."  (Doc. 44 at 53.)  This raises the inference that CBI believed Plaintiff was unacceptably absent from work and that this belief (rather than the proffered neutral

justification of a business restructuring) was the real reason for her termination. Separately, Plaintiff identifies the Indeed.com job posting. A reasonable juror could find that this evidence contradicts CBI's assertion that it "did not assign or hire anyone to fill Plaintiff's position," as the posting is for a position with an identical title as Plaintiff's previous position. Taken together with Plaintiff's assertions that DaCosta consistently wanted Plaintiff to "go out on leave" or otherwise encouraged her to leave CBI, a reasonable jury could conclude that CBI's sole proffered justification for the elimination of Plaintiff's position—a restructuring—was pretextual.[11]

In a related vein, CBI is not entitled to summary judgment based on its argument that "Title VII does not preclude an employer from subsequently recreating a job position, particularly at a place like CBI, where programs constantly change based on the sources of grant funding for CBI's various programs." (Doc. 47 at 6.) Although this may be true in theory, CBI has offered no evidence that Plaintiff's position was eliminated and subsequently reinstituted due to changes in grant funding. Similarly, CBI argues that it "did not have any legal obligation to keep Plaintiff's job position available to her at all, because her leaves of absence were not legally protected, and CBI advised Plaintiff of this legal reality in both of its approval letters." (*Id.*) Irrespective of whether this proposition is true in theory, CBI could not terminate Plaintiff's employment *because* it perceived her to be disabled. *Kennedy*, 90 F.3d at 1481 ("[T]o prevail on an employment termination claim under the ADA, a plaintiff must establish . . . that the employer terminated him because of his disability.").

…

…

---

[11]     In the tentative ruling issued before oral argument, the Court identified another potential basis for finding pretext, which concerned whether CBI actually eliminated all of the programs that Plaintiff previously oversaw. During oral argument, CBI's counsel suggested that Plaintiff's arguments on this point are unsupported by any cognizable evidence in the record. Upon reflection, CBI appears to be correct on this point, although the elimination of this basis does not change the Court's ultimate conclusion that, at least on the present record (and without prejudice to any evidence and arguments CBI may present in its renewed motion), CBI is not entitled to summary judgment on the issue of pretext.

2.     Failure To Accommodate

Plaintiff also appears to contend that CBI did not adequately accommodate her disability.

Acknowledging once again the lack of clarity in the parties' briefing, it appears CBI's main argument is that "Plaintiff cannot prevail on a claim that CBI failed to accommodate a disability because it is undisputed that she did not disclose the nature of her disability to CBI at any time during her employment, making it impossible for CBI to know how to accommodate Plaintiff's undisclosed disability."  (Doc. 43 at 5.)  This argument is unavailing for the reasons stated in the previous section—although Plaintiff may not have identified the nature of her various impairments in her October 1, 2020 email, she subsequently provided an array of information about her impairments and formally submitted a reasonable accommodation request.  *Snapp*, 889 F.3d at 1095 ("The Ninth Circuit has held that notifying an employer of a need for an accommodation triggers a duty to engage in an 'interactive process' through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee.").  The Ninth Circuit has also clarified that "[i]n circumstances in which an employee is unable to make [an accommodation] request, if the company knows of the existence of the employee's disability, the employer must assist in initiating the interactive process."  *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000), *vacated on other grounds sub nom. U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

It is important to note the limited nature of the conclusion being reached here.  As discussed, the Court understands CBI's motion as challenging only whether Plaintiff made a disclosure of the nature of her impairment.  For the reasons stated above, a reasonable juror could conclude that she did.  CBI does not, in contrast, seek summary judgment on the ground that Plaintiff failed to engage in the interactive process after making her disclosure.  *Compare Allen v. Pac. Bell*, 348 F.3d 1113, 1115 (9th Cir. 2003) ("Because Allen was requested, but failed, to submit additional medical evidence that would serve to

1   modify his doctor's prior report, . . . Pacific Bell did not have a duty under the ADA . . . to

2   engage in further interactive processes . . . ."). CBI may very well prevail on the ground

3   at a later stage of this case, but the Court limits its analysis here to the arguments squarely

4   raised in CBI's summary judgment motion.

5         B.   **Title VII—Religion**

6         As explained in Part I.B, Plaintiff administratively exhausted her religious

7   discrimination claim. CBI's argument that "Plaintiff's October 1, 2020 email" does not

8   refer to "any issues involving . . . religion" (Doc. 43 at 3) is irrelevant for exhaustion

9   purposes—the only exhaustion requirement arises from the administrative process.

10         On the merits, CBI's first argument is that "Plaintiff failed to disclose evidence

11   during discovery to prove that Ms. DaCosta treated Plaintiff less favorably because of

12   Plaintiff's . . . religion." (Doc. 43 at 2.) This argument is unavailing. Plaintiff's allegations

13   of religious discrimination appear in her EEOC charge, which was signed under penalty of

14   perjury, and that charge is part of the evidence disclosed during discovery in this case.

15   Accordingly, the factual allegations in the EEOC charge (unlike the factual allegations in

16   Plaintiff's complaint and summary judgment brief, neither of which were signed under

17   penalty of perjury) are properly part of the summary judgment record. *Rodriguez-Severino*,

18   52 F.4th at 460-61; *Yeomans*, 2010 WL 3716394 at *4. Plaintiff would be able to testify,

19   as she explained in her EEOC charge, that once DaCosta learned about her religious

20   affiliation, DaCosta stopped speaking to her, changed her work schedule, and potentially

21   hacked her cell phone. (Doc. 1 at 6, 11.) Although Plaintiff's complaint explains that she

22   "believed these actions were retaliation for reporting Ms. DaCosta's discrimination in the

23   October 1st complaint," reading Plaintiff's summary judgment brief and complaint

24   liberally, Plaintiff directly contrasted DaCosta's inquiry into her religion with increased

25   hostility through the end of October 2020. (Doc. 1 at 6 ¶¶ 15-16; *id.* at 11.) The close

26   temporal proximity between the religious disclosure and increased hostility could provide

27   the basis for an inference of discriminatory motive. *Villiarimo*, 281 F.3d at 1065.

28         CBI also seeks summary judgment on Plaintiff's religious discrimination claim on

1   the ground that Plaintiff lacks evidence of an adverse employment action in relation to that

2   claim.   (Doc. 43 at 6.)   CBI elaborates that "[p]etty slights or snubs are not legally

3   actionable under Title VII."   (*Id.*, citations omitted.)

4          The Court agrees with CBI on this point.   "As a general matter, lack of contact with

5   an employee or co-worker does not constitute adverse employment action."   *Blount v.*

6   *Morgan Stanley Smith Barney LLC*, 982 F. Supp. 2d 1077, 1082 (N.D. Cal. 2013), *aff'd*,

7   624 F. App'x 965 (9th Cir. 2015).   In the retaliation context, the Ninth Circuit has

8   repeatedly affirmed that "mere ostracism by co-workers does not constitute an adverse

9   employment action."   *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000) (internal

10  citations omitted); *accord Manatt*, 339 F.3d at 798 ("Title VII, is not a 'general civility

11  code.'") (citation omitted).   District courts, in turn, have applied this rule in discrimination

12  cases.   *See, e.g.*, *Blount*, 982 F. Supp. 2d at 1082 ("The definition of adverse employment

13  action does not extend, however, to rude or offensive comments or mere ostracism.").

14  Plaintiff's essential complaint, in relation to her claim of religious discrimination, is that

15  DaCosta ignored her and made rude remarks,[12] but such actions do not qualify as adverse

16  employment actions.

17         The only other potential adverse employment actions with respect to the religious

18  discrimination claim are that DaCosta "reassigned Ms. Alfonso's work to others" and

19  "changed Ms. Alfonso's schedule from working from home one day a week to two days a

20  week."   (Doc. 1 at 6, 11.)   However, Plaintiff has offered nothing other than a bare

21  allegation that DaCosta reassigned some unidentified portion of Plaintiff's work to others.

22  Plaintiff has "presented no evidence that she was reassigned to less desirable tasks," that

23  she was "demoted," or that any of "her essential job functions changed."   *Roberson v.*

24  *Tacoma Cmty. Coll.*, 2015 WL 2360278, *3 (W.D. Wash. 2015), *aff'd*, 668 F. App'x 739

---

25  [12]        *See, e.g.*, Doc. 1 at 11 ("The two weeks following this lunch the Senior Director of
26  H&CI hardly spoke with Ms. Alfonso."); *id.* ("On October 30, 2020, the Senior Director
    of H&CI refused to be in the same room as Ms. Alfonso."); *id.* ("The Senior Director of
27  H&CI made comments such as '[Ms. Alfonso] should go out on a long extended leave or
    vacation,' she would ignore Ms. Alfonso's presence around other staff members, . . . and
28  stated, 'how if [Ms. Alfonso] was smart [she] could look out to the landscape and see that
    [another employee] was next in line to be the Associate Director.'").

(9th Cir. 2016). Without more, Plaintiff cannot establish that she suffered a significant change in her employment status. *Id.* Similarly, Plaintiff does not explain why working from home two days a week instead of one "materially affect[ed] the compensation, terms, conditions, or privileges of [her]. . . employment." *Davis*, 520 F.3d at 1089.

To the extent Plaintiff is arguing that the adverse employment action of cancelling her short-term disability benefits was motivated by religious discrimination (Doc. 44 at 7), that position is belied by the record. Not only does Plaintiff herself contend that the cancellation was the result of a clerical error (which is inconsistent with a theory of intentional religious discrimination), but it is undisputed that those benefits were cancelled long before the alleged incident in October 2020 when DaCosta became aware of Plaintiff's religion. (Doc. 43-3 ¶¶ 6-7 ["The foregoing payment was withdrawn on May 1, 2020, shortly after Plaintiff began her employment. CBI did not withdraw any other payments for short-term disability after May 1, 2020."]; Doc. 44 at 33 ["I elected and enrolled in STD yet it seems after two months when they back dated my insurance benefits to accommodate a medical emergency that my son endured CBI inadvertently cancelled my plan without my consent or knowledge."].)

Finally, to the extent Plaintiff is arguing that the adverse employment action of termination or demotion was motivated by religious discrimination (*see* Doc. 44 at 7), that contention lacks evidentiary support. Plaintiff's termination occurred in February 2021, five months after the alleged conversation and actions related to Plaintiff's religious disclosure. "We have recognized previously that, in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity. But timing alone will not show causation in all cases; rather, in order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression." *Villiarimo*, 281 F.3d at 1065 (internal citations omitted). In *Villiarimo*, the Ninth Circuit cited *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390 (7th Cir. 1999), for the proposition that a four-month gap is too attenuated for a temporal proximity inference. 281 F.3d at 1065. Following this reasoning, Plaintiff cannot

rely on the relevant timeline in this case—religious disclosure in October 2020, termination in February 2021—to tie her alleged claims of religious discrimination to her termination. Therefore, CBI's request for summary judgment as to Plaintiff's religious discrimination claim is granted.

C.   **Title VII—National Origin**

CBI's arguments as to Plaintiff's national origin claim generally track CBI's arguments as to Plaintiff's religion and disability claims—*i.e.*, Plaintiff cannot meet elements three or four of the *McDonnell-Douglas* framework, and even if she could, CBI is covered by the *Faragher* affirmative defense.  (Doc. 43 at 2, 6-7.)  Plaintiff's briefing does not address her national origin claim.

Although a district court does not have "a duty to search for evidence that would create a factual dispute," *Bias*, 508 F.3d at 1219, in an abundance of caution, the Court has reviewed all of the parties' submitted exhibits and can find no evidence that would support Plaintiff's discrimination claim based on national origin.  In her EEOC charge, Plaintiff alleged that "the Senior Director of H&CI constantly treated the Associate Director of H&CI, who is a white female, much more favorably than [Plaintiff], who is Cuban."  (Doc. 1 at 9.)  However, Plaintiff does not provide any evidence or argument that her termination was related to her national origin.  Indeed, in her summary judgment brief, there is no mention of Plaintiff's Cuban heritage,[13] and her EEOC charge references it only once. Although the burden of proof to establish a *prima facie* case is "minimal," *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994), Plaintiff has made no attempt to factually identify what adverse action was taken in relation to her national origin or show that the action was taken because of her national origin.[14]  Therefore, CBI is entitled to summary judgment on this claim.  *See also Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993,

---

[13]      Plaintiff does reiterate that "she was subjected to disparate treatment then [sic] that of her white co-worker," but offers no additional explanation.  (Doc. 44 at 3.)

[14]      The Court notes that, during oral argument, Plaintiff focused exclusively on her ADA claims and did not challenge the conclusions set forth in the tentative order related to her other claims.

1003 (9th Cir. 2019) ("Although the requisite level of proof necessary for a plaintiff to establish a prima facie Title VII case at the summary judgment stage is minimal and does not even need to rise to the level of a preponderance of the evidence, the plaintiff still must produce evidence, not just pleadings or argument.") (internal quotation marks and citation omitted).

III.    Hostile Work Environment

"To establish the prima facie hostile work environment claim. . . [Plaintiff] must raise a triable issue of fact as to whether (1) she was 'subjected to verbal or physical conduct' because of her [protected characteristic], (2) 'the conduct was unwelcome,' and (3) 'the conduct was sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive work environment.'" *Manatt*, 339 F.3d at 798.[15]

Here, CBI primarily challenges element three, arguing that even assuming Plaintiff's allegations are true, they "do not establish that Ms. DaCosta's alleged conduct was 'severe or pervasive enough to alter the conditions of [Plaintiff's] employment." (Doc. 43 at 7-8, citations omitted.)  Relatedly, CBI argues that Plaintiff "cannot establish a prima facie claim through isolated offensive remarks."   (*Id.* at 8-9.)   Plaintiff does not meaningfully address these arguments.   Instead, she overwhelmingly focuses on the behavior of her terminated subordinate.  (Doc. 44 at 9 ["The behavior by [the terminated subordinate] was so pervasive to alter the conditions of Plaintiff's employment and create an abusive work environment . . . .."]; *id.* ["Plaintiff reported [the terminated subordinate's] physical threats of harm."].)  As for DaCosta, Plaintiff simply states there was "threatening and intimidating behavior displayed by . . . DaCosta" and "[d]iscussions took place with Ms. DaCosta in which Plaintiff described a negative effect on her psychological well-being." (*Id.*)

---

[15]    Although *Manatt* sets out the elements of a hostile work environment claim under Title VII, the Court assumes that the same elements apply when evaluating a hostile work environment claim under the ADA.  *Armijo v. Costco Wholesale Warehouse, Inc.*, 2022 WL 1267254, *14 (D. Haw. 2022) ("The Ninth Circuit has not ruled on the issue of whether a hostile work environment claim can be brought under the ADA.  To the extent that such a claim exists, its elements are similar to the elements of a Title VII hostile work environment claim.") (citations omitted).

Plaintiff's hostile work environment claim fails for a variety of reasons.  To start, the terminated subordinate's behavior is not properly before the Court because it went unexhausted before the EEOC and is not factually supported here.  As for the conduct of DaCosta, even under a liberal construction of Plaintiff's briefing, together with the theories put forward in her EEOC charge and her complaint, Plaintiff has neither alleged nor demonstrated that DaCosta's "conduct was sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive work environment."  *Manatt*, 339 F.3d at 798 (citations omitted).  "To determine whether conduct was sufficiently severe or pervasive to violate Title VII, courts look at all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Knight v. Brown*, 797 F. Supp. 2d 1107, 1131 (W.D. Wash. 2011) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  Here, at most, DaCosta stated that she wanted Plaintiff to quit.  (Doc. 1 at 8 ¶ 23; *id.* at 11 ["Oftentimes, the Senior Director of H&CI would yell at Ms. Alfonso seemingly as an attempt to get Ms. Alfonso to resign."]; Doc. 44 at 33 ["I received this email from Liz asking me to report to a work location that I was not reporting to prior to my medical leave.  I had a TIA/mini-stroke and I'm only 3 weeks out.  I see that Ms. DaCosta continues at her attempts for me to quit my employment with CBI."].)  But the timing of these remarks is limited to a handful of days.  Although the comments may have been inappropriate, they were neither frequent enough in duration nor offensive enough in substance to constitute an "abusive work environment."[16]  *See, e.g.*, *Manatt*, 339 F.3d at 798 ("Viewing the evidence in the light most favorable to Manatt, we conclude that the conduct of Manatt's co-workers and supervisor [which included repeated racial jokes and referring to Manatt as 'China woman']—while offensive and inappropriate—did not so pollute the workplace that it altered the conditions of her employment."); *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 649 (9th Cir. 2021) ("Because Fried testified that Barajas made her comments on one

---

[16]    Plaintiff has not alleged that DaCosta physically assaulted or threatened her.

occasion and his coworkers suggested on two occasions that he should wear a wig to look like a woman, the comments would have to be proportionately more severe to make up for their relative infrequency.  The comments here fall far short of that mark.  Indeed, we have deemed much harsher comments and actions insufficient to create a hostile work environment.") (internal citations omitted).

Separately, Plaintiff has not articulated how DaCosta's statements relate to a protected characteristic.  *Fried*, 18 F.4th at 649 ("Barajas's comments did not directly pertain to Fried's sex or race.").  *Compare McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1115 (9th Cir. 2004) ("Additionally, McGinest was subjected to extreme racial insults, as well as more subtle taunts, by supervisors and coworkers.  Racist graffiti . . . regularly appeared in the bathroom and on equipment . . . .").  Not being treated "fairly/respectful[ly] in a work environment" (Doc. 44 at 21) is not tantamount to a hostile work environment that is actionable under Title VII.  *Lalau v. City & Cnty. of Honolulu*, 938 F. Supp. 2d 1000, 1017 (D. Haw. 2013) ("Because, notwithstanding Lalau's use of the term 'hostile work environment,' Lalau provides no evidence establishing that his workplace was permeated with discriminatory intimidation relating to his national origin or his age, summary judgment is granted to the City with respect to any 'hostile work environment' claims he may have been trying to assert under Title VII.").  Accordingly, CBI's request for summary judgment as to any hostile work environment claim is granted.

IV.  Retaliation

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee . . . because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)).  "Like discrimination, retaliation may be shown using the *McDonnell Douglas* burden shifting framework."  *McGinest*, 360 F.3d at 1124.  The causal link is governed by a "but-for" test.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  If a *prima facie* case is established, "the burden shifts to the defendant to set

forth a legitimate, non-retaliatory reason for its actions; at that point, the plaintiff must produce evidence to show that the stated reasons were a pretext for retaliation." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008).

CBI argues that Plaintiff "cannot satisfy any of these three prongs, because there is no evidence that Plaintiff engaged in protected activity and, without proof of protected activity, she cannot establish the causation requirements embodied by the second and third prongs of the test for retaliation." (Doc. 43 at 10.) In response, Plaintiff argues that DaCosta instituted an array of changes like "changing her work schedule, exclusion of meetings, hiring/firing staff that reported to Plaintiff without any discussion" after she sent the October 1, 2020 email. (Doc. 44 at 9.) In reply, Defendant argues that "[b]ecause it is undisputed that Plaintiff never complained to CBI about unlawful discrimination, it logically follows that she did not engage in 'protected activity' as a matter of law." (Doc. 47 at 11.) This conclusion stems from Defendant's interpretation of Plaintiff's October 1, 2020 email as "merely complain[ing] about the normal day-to-day stresses of her job duties and her apparent personality conflict with Ms. DaCosta. She never once informed CBI that she was opposing unlawful racial or religious discrimination. At best, Plaintiff only complained about the stressful nature of her job and her feelings of being personally slighted." (*Id.*) In the alternative, CBI argues that Plaintiff cannot prove causation or that she was "subjected to an adverse employment action." (*Id.* at 12.)

Conduct constituting "protected activity" under Title VII "includes the filing of a charge or complaint, or providing testimony regarding an employer's alleged unlawful practices, as well as engaging in other activity intended to oppose an employer's discriminatory practices." *Raad v. Fairbanks N. Star Borough*, 323 F.3d 1185, 1197 (9th Cir. 2003) (citation and internal quotation marks omitted). "An employee need not establish that the opposed conduct in fact violated [Title VII] in order to establish a valid claim of retaliation." *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988). "That is, an employee may fail to prove an 'unlawful employment practice' and nevertheless prevail on his claim of unlawful retaliation." *Id.* "However, the opposed conduct must

fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation." *Id.* *See also Kurdi v. Cal. Dep't of Trans.*, 2023 WL 267538, *6 (E.D. Cal. 2023) ("[I]f an employee does not sufficiently allege that she opposed discrimination based upon race, color, religion, sex, or national origin, she cannot claim that she engaged in a protected activity."). Although Plaintiff's October 1, 2020 email contains some buzzwords associated with unlawful employment practices—*i.e.*, a coworker "create[ed] a *hostile work environment* by 'yelling at me' and as you stated a perpetual pattern of gossip and not to mention her followers" and Plaintiff did "not feel that [she was] receiving *equal treatment* compared to those in similar situated positions" (Doc. 44 at 21, emphases added)—the actual conduct Plaintiff described in the letter is unrelated to any "unlawful employment practice" prohibited by Title VII. In Plaintiff's description of the events that led to her grievance, she complains of the process for terminating an employee and seemingly inappropriate comments about firing other employees, notes that she generally has a "high demand/high stress job," alleges that another employee has yelled at her and that DaCosta's comments could have been "intended as a suggestion for me to quit," and states that Plaintiff will be taking a "mental health day." (*Id.* at 21-23.) Even reading the email in the light most favorable to Plaintiff, it does not describe discrimination in violation of Title VII. Therefore, the letter could not have qualified as a protected activity.[17]

---

[17]      Although it is possible to assert a retaliation claim under the ADA, Plaintiff has not asserted one here. The Court reaches this conclusion for several reasons. First, the Ninth Circuit has clarified that "ADA retaliation claims"—or, at least, retaliation claims arising under Title I of the ADA, such as the claim here—"are redressable only by equitable relief." *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1270 (9th Cir. 2009). *See also Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862-63 (9th Cir. 2017); *Hanson v. Or., Legis. Assembly*, 2023 WL 22196, *12 (D. Or. 2023) (agreeing that, under *Alvarado*, "Title I ADA retaliation claims 'are redressable only by equitable relief'"). Here, Plaintiff did not assert a claim for equitable relief in her complaint (Doc. 1) and has suggested in other filings that she is only seeking monetary damages (Doc. 17 at 5). Second, the sole mention of retaliation in the complaint appears in paragraphs 16 and 17, where Plaintiff alleges that DaCosta's actions in late October 2020 "were in retaliation for reporting Ms. DaCosta's discrimination in the October 1st complaint" and that this "retaliatory treatment caused [Plaintiff] extreme emotional distress . . . ." (Doc. 1 at 6-7 ¶¶ 16-17.) Similarly, Plaintiff's response to CBI's summary judgment motion includes a section entitled "Plaintiff Established a Claim of Retaliation." (Doc. 44 at 9-10.) Here, Plaintiff references Title VII and then argues that the retaliation occurred when "DaCosta took Plaintiff's complaints [in the October 1, 2020 letter] regarding [a coworker's] misconduct as a personal attack . . . [and] then retaliated against Plaintiff . . . ." (*Id.*) Nowhere does Plaintiff allege that she suffered retaliation for other reasons (such as in response to her submission of a reasonable

## V.   Vicarious Liability And The *Ellerth/Faragher* Defense

"Under Title VII, an employer's liability for such harassment may depend on the status of the harasser. . . .   If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.   But if no tangible employment action is taken, the employer may escape liability by establishing . . . an affirmative defense." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).   The *Ellerth*/*Faragher* affirmative defense requires the employer show "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."   *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007) (quoting *Faragher*, 524 U.S. at 807). "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance*, 570 U.S. at 424.

CBI has two theories as to why Plaintiff's claims are barred under the *Ellerth/Faragher* doctrine.   (Doc. 43 at 12.)   First, relying on *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), CBI argues that "Plaintiff failed to assert any theory of vicarious liability against CBI anywhere in her Complaint to establish a basis for holding CBI liable for Ms. DaCosta's alleged conduct."   (*Id.*)   Second, and alternatively, CBI argues that "any such allegations would still fail as a matter of law because Ms. DaCosta did not take any tangible employment actions against Plaintiff."   (*Id.*)   Also, at various points in its briefing, CBI argues it is entitled to the *Ellerth/Faragher* defense because "it is undisputed that CBI adopted reasonable policies and procedures for preventing and reporting discrimination, as evidenced by its Anti-Discrimination Policy, and its prompt efforts to meet with Plaintiff and investigate her concerns."   (*Id.* at 7, citations omitted; *id.* at 6-7.)   In response, Plaintiff argues "CBI failed to exercise reasonable care to prevent and correct promptly any harassing behavior and plaintiff took opportunities to correct and avoid on-going harm and

accommodation request).

thus cannot avoid liability or damages." (Doc. 44 at 10.) Plaintiff also contends that "DaCosta was plaintiff's direct supervisor with the authority granted to her by CBI to discipline and evaluate performance." (*Id.*) CBI makes no additional arguments in reply.

CBI's arguments regarding vicarious liability and the *Ellerth/Faragher* doctrine require little discussion in light of how CBI's other summary judgment arguments have been resolved. As discussed, the only remaining claims in this case are Plaintiff's ADA claims (termination and failure to provide a reasonable accommodation). Such claims may only be brought against CBI and may not be brought against individual supervisors such as DaCosta. *Walsh v. Nevada Dep't of Human Res.*, 471 F.3d 1033, 1037-38 (9th Cir. 2006) ("Because Title I of the ADA adopts a definition of 'employer' and a remedial scheme that is identical to Title VII, [the] bar on suits against individual defendants also applies to suits brought under Title I of the ADA. The district court was correct when it held that individual defendants cannot be held personally liable for violations of the ADA."). It follows that Plaintiff was not required, under *Iqbal*, to meet some additional "vicarious liability" pleading hurdle before being allowed to assert such claims against CBI. Meanwhile, it does not appear that the *Ellerth/Faragher* defense applies to such claims, which are not premised on the existence of a hostile work environment and turn, at least in part, on Plaintiff's contention that she was subjected to tangible employment actions. *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 959 (9th Cir. 2004) ("In *Ellerth* and [*Faragher*], the Supreme Court provided a framework for assessing an employer's liability where the plaintiff can show that she was subjected to a hostile environment. Within this framework, there are two, alternative theories under which a plaintiff may establish an employer's vicarious liability for sexual harassment. First, an employer is vicariously liable for a hostile environment that culminates in a tangible employment action. Second, when no tangible employment action has been taken, an employer may raise an affirmative defense . . . .") (cleaned up). *See generally Baird v. Office Depot*, 2014 WL 2527114, *7 (N.D. Cal. 2014) ("Defendants' reliance on *Ellerth / Faragher* is misplaced because Plaintiff does not assert a hostile work environment or

harassment claim.  Even had Plaintiff stated such claims, the doctrines are inapplicable because Plaintiff alleges a tangible employment action . . . ."); *Cooke v. Stefani Mgmt. Servs., Inc.*, 250 F.3d 564, 567 n.2 (7th Cir. 2001) ("Two recent Supreme Court cases, [*Ellerth* and *Faragher*], establish an affirmative defense for employers in hostile environment cases when one of their supervisors perpetrates the harassment. . . .  But the Supreme Court was careful to limit this defense to cases in which no 'tangible employment action' was taken against the employee.  In this case, Lagon's termination of Cooke was a 'tangible employment action,' so the *Ellerth/Faragher* defense cannot protect Stefani from liability.") (citations omitted).

## VI. Successive Summary Judgment Motion

Although two of Plaintiff's ADA claims (termination and failure to accommodate) have survived summary judgment, it is possible that CBI has meritorious defenses to those claims.  As discussed elsewhere in this order, Plaintiff's claims and evidence have proved to be a bit of a moving target, which greatly complicated CBI's task of establishing an entitlement to relief under Rule 56.  Under the circumstances, the Court concludes that CBI should be granted leave to file a successive motion for summary judgment in relation to Plaintiff's remaining claims.  Perhaps those claims will survive the next round of summary judgment briefing, but the Court concludes that the authorizing additional briefing will best promote Rule 1's aims.  *Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010) (holding that "district courts have discretion to entertain successive motions for summary judgment" and noting that "allowing a party to file a second motion for summary judgment" can be "logical" and "foster[ ] the 'just, speedy, and inexpensive' resolution of suits") (quoting Fed. R. Civ. P. 1); *Anderson v. Intel Corp.*, 2021 WL 1087127, *16 (D. Ariz. 2021) (authorizing successive summary judgment motion under analogous circumstances).

…

…

…

Accordingly,

**IT IS ORDERED** that CBI's motion for summary judgment (Doc. 43) is **granted in part and denied in part**.  Plaintiff's only surviving claims are her ADA claims (termination and failure to provide a reasonable accommodation).

**IT IS FURTHER ORDERED** that CBI may, within 30 days of the issuance of this order, file a successive summary judgment motion directed toward Plaintiff's remaining claims.

Dated this 2nd day of August, 2023.

Dominic W. Lanza
United States District Judge