**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Lisa Alfonso,

                Plaintiff,

v.

Community Bridges, Inc.,

                Defendant.

No. CV-21-01305-PHX-DWL

**ORDER**

Lisa Alfonso ("Plaintiff") began working for Community Bridges, Inc. ("CBI") in March 2020. In November 2020, Plaintiff began a leave of absence due to health issues. In February 2021, CBI informed Plaintiff that her position had been eliminated and offered her a temporary position, which she declined. Plaintiff, who is proceeding *pro se*, then sued CBI for violating the Americans with Disabilities Act ("ADA"), among other claims.

Now pending before the Court is CBI's renewed motion for summary judgment. (Doc. 62.) For the following reasons, the motion is granted.

## BACKGROUND

### I.  Preliminary Matters

In their motion papers, the parties present differing accounts of the events giving rise to Plaintiff's claims. The rule at summary judgment, of course, is that all legitimate disputes of fact must be resolved in Plaintiff's favor as the non-movant. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).

The analysis is complicated here, however, because some of the deficiencies in

Plaintiff's briefing that the Court identified in the earlier summary judgment order (Doc. 59 at 1-4) are still present.  Consistent with Rule 56(c)(1), CBI's motion includes a statement of facts (Doc. 62 at 2-6) and is supported by a series of exhibits—which take the form of declarations, deposition transcripts, documents, and emails—offered to substantiate those factual assertions (Doc. 62-1).  Unfortunately, although Plaintiff occasionally indicates, in her summary judgment response, that she disagrees with certain factual assertions by CBI (*see, e.g.*, Doc. 65 at 4 ["Contrary to Defendant's submission in there [sic] (Exhibit 10)[,] Ms. Waller did responded [sic] to Plaintiff's email . . . ."]), she does not address many of CBI's other factual assertions.  Instead, Plaintiff offers a winding narrative of various events that occurred before, during, and after her employment at CBI. (*Id.* at 3-7.)

In a related vein, although Plaintiff attempts to substantiate some of her factual assertions by citing the exhibits appended to her response brief, many of the factual assertions appearing in her brief are bereft of citations to the record.  During the last round of summary judgment briefing, the Court explained that those unsupported factual assertions had no evidentiary value because Plaintiff had not signed her brief under penalty of perjury.  (Doc. 59 at 2.)  Plaintiff has now corrected that omission by signing her response to CBI's renewed summary judgment motion under penalty of perjury.  (Doc. 65 at 11 ["Under penalty of perjury, I declare that I have read the foregoing, and the facts alleged therein are true and correct to the best of my knowledge and belief."].) Accordingly, the factual assertions appearing in her second summary judgment brief—like the factual assertions appearing in the EEOC charge she signed under penalty of perjury (Doc. 59 at 2-3)—have evidentiary value at summary judgment.  *See, e.g., Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) ("[B]ecause Jones is *pro se*, we must consider as evidence in his opposition to summary judgment all of Jones's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where Jones attested under penalty of perjury that the contents of the motions or pleadings are true and correct."); *Schroeder v.*

*McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995) (clarifying that the statement "the facts stated in the complaint are true and correct as known to me" satisfies the requirement to swear under penalty of perjury in 28 U.S.C. § 1746) (cleaned up).  With that said, those assertions must still be based on Plaintiff's personal knowledge.  *Jones*, 393 F.3d at 923.

Given this backdrop, CBI argues that because "Plaintiff did not dispute or otherwise oppose any portion of Defendant's Statement of Facts" and "Plaintiff's Response is once again filled with numerous assertions that are not supported by admissible evidence," "all of the facts set forth in Section I of [CBI's] Motion for Summary Judgment must be accepted as true for the purposes of [CBI's] Motion" and "Plaintiff's repeated violation of Rule 56(c) should compel the entry of summary judgment under Rule 56(e)(3)."  (Doc. 67 at 2, internal citation omitted.)

CBI made a similar argument during the last round of summary judgment briefing and it remains flawed for the reasons previously stated.  (Doc. 59 at 4.)  Although Plaintiff repeatedly violated Rule 56(c), either by not properly controverting CBI's proffered facts or by failing to identify evidence in the record to support her version of the facts, she did comply with Rule 56(c) in some instances.  Accordingly, the Court cannot simply accept all of the facts in CBI's motion and grant summary judgment on that basis.  Instead, the Court may treat as undisputed only the subset of facts in CBI's motion that Plaintiff failed to properly controvert.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").  Similarly, the Court cannot ignore all of the factual assertions in Plaintiff's brief.  Instead, it must identify and credit the subset of the factual assertions that have evidentiary value at summary judgment.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").  The Court has followed this approach in Part II below, when summarizing the relevant facts.

…

…

II.   <u>Relevant Factual Background</u>

In March 2020, CBI hired Plaintiff as an Associate Director of Housing and Community Integration.  (Doc. 1 at 9.)  Plaintiff's direct supervisor was Elizabeth DaCosta.  (*Id.* [referring to DaCosta as the Senior Director of Housing and Community Integration]; Doc. 65 at 3.)  During her interview for the position, Plaintiff informed CBI that she had fatty liver disease and IBS.  (Doc. 62-1 at 51.)

Upon being hired, Plaintiff opted to enroll in short-term disability ("STD") coverage.  (Doc. 43-3; Doc. 44 at 18.)  However, Plaintiff only made one premium payment before her coverage was cancelled.  (Doc. 43-3; Doc. 44 at 18.)  The parties dispute why the coverage was cancelled—Plaintiff claims it was a clerical error on CBI's part (Doc. 65 at 3-4, 7), while CBI contends that Plaintiff declined coverage during open enrollment (Doc. 43 at 2; Doc. 43-3 ¶¶ 8-10).  This dispute is not material for summary judgment purposes.

On October 1, 2020, Plaintiff emailed DaCosta about an event on September 30, 2020 that left Plaintiff "feeling very uncomfortable about the entire situation."  (Doc. 43-5 at 2.)  Specifically, Plaintiff complained that she had been excluded from part of a meeting in which one of her direct reports was terminated.  (*Id.*)[1]  Plaintiff indicated that she would be filing a "formal complaint," "taking a mental health day today and tomorrow and utilizing PTO," and returning to work on October 12, 2020, after a "previously approved vacation."  (*Id.* at 2-3.)

In a reply email, DaCosta stated that she had reached out to Jessica Waller, a CBI human resources representative, who would be providing Plaintiff "with the formal grievance form should [Plaintiff] chose [sic] to complete it."  (Doc. 43-6 at 2.)[2]  DaCosta

[1]    Plaintiff's summary judgment brief includes a narrative relating to this terminated employee, whose "negligence on the job . . . lead [sic] to the death of a resident and infant at the Center for Hope and ultimately the documented complaints of October 1, 2020." (Doc. 65 at 4, 8-9.)  The Court has omitted the majority of the details related to this narrative because they are not relevant to Plaintiff's ADA claims.

[2]    Plaintiff disputes receiving DaCosta's reply: "If you refer to [CBI's] (Exhibit 5) you will see that no date/time stamp exists in Ms. DaCosta's alleged response.  Her response was written into Plaintiff's original email dated October 1, 2020." (Doc. 65 at 4.)  This dispute is not material for summary judgment purposes.

also included her "account of the event" and assured Plaintiff that "I cannot express enough how in no way were any parts of the conversation yesterday meant to make you feel as if you were underperforming or should resign.  I look forward to our continued work together, sharing our strengths to further develop our staff and department." (*Id.* at 2-4.)  DaCosta also confirmed Plaintiff's plan to return to work on October 12, 2020. (*Id.* at 4.)

On October 15, 2020, Plaintiff and DaCosta "went to lunch to address [Plaintiff's] complaint." (Doc. 1 at 11.)  Plaintiff contends that, during the lunch, they discussed the bracelet Plaintiff wore, its religious significance, and her identification as part of the IFA faith. (*Id.*)

According to Plaintiff, over the following two weeks, DaCosta, who is Christian, "hardly spoke" to her, "refused to be in the same room as" her, switched her work schedule, and made comments about her role at CBI. (*Id.*)  Plaintiff also contends that her "work cell phone was hacked" during this period. (*Id.*)  Plaintiff contends that this conduct caused her to suffer "extreme emotional distress leading to an urgent care visit, multiple ER visits, and now [she] currently sees seven different specialists for treatment." (*Id.*)

On November 2, 2020, Plaintiff did not report for work. (Doc. 43-9 at 2 [November 4, 2020 email: "[A]ttached is my note from ER for Monday's absence"].)

On November 3, 2020, Plaintiff emailed Melissa Metcalf, CBI's human resources generalist, and provided a doctor's note excusing her from work between November 3, 2020 and November 10, 2020. (*Id.* at 3 [Metcalf, confirming receipt of the note].)[3]  Plaintiff also confirmed receipt of the "formal grievance form" and notified Metcalf that she "will be completing [it] once I am physically able to and upon release" from the emergency room. (*Id.*)

On November 5, 2020, Plaintiff forwarded a copy of her October 1, 2020 email to Teresa Steege, CBI's human resources manager, explaining that she had "been enduring a very serious medical concern on set [sic] by stress from [her] employment with CBI."

---

[3]     This doctor's note is not included in the record.

(Doc. 44 at 20.)[4]  Plaintiff also relayed the allegations of her phone being hacked (*id.* at 22), a coworker receiving favoritism (*id.* at 22-23), and additional incidents with DaCosta (*id.* at 23-25).  Plaintiff concluded by explaining that her "only medical conditions are IBS and fatty liver none of which is what I am dealing with now," but "I have spent two days in ER for high blood pressure and pre-stroke symptoms, multiple doctors appointments due to the stressors from work" and "[s]ince I was not provided with the correct CBI formal grievance form by Melissa[, p]lease accept this as my formal grievance, I will sign any paperwork I have to upon my return to work."  (*Id.* at 24-25.)

On November 10, 2020, Waller emailed Plaintiff, with Metcalf copied, confirming receipt of Plaintiff's grievance and asking to set up a time to discuss.  (Doc. 43-11 at 2.)  Plaintiff replied: "Unfortunately, I am unable to return to work at this time due to health reasons.  I spoke with [Metcalf] after my doctors appointment today and will be filing for STD and a medical leave of absence."  (*Id.*)  That same day, Waller responded: "I am sorry to hear of your health struggles.  We want you to focus on your recovery and we are happy to talk about your grievance upon your return. . . .  I am wishing you a speedy recovery."  (Doc. 65 at 15.)[5]

Also on November 10, 2020, Plaintiff separately emailed Metcalf:

> Unfortunately, my doctor has extended my return to work date due to the current status of my health.  I am unable to return to work at this time.  She will be sending a note—that I can provide to you once received.  In the meantime, I would like to request a medical leave of absence and have emailed benefits regarding my STD benefits.

(Doc. 62-1 at 14.)  In a response email sent that same day, Metcalf provided Plaintiff with "the medical leave of absence approval letter" and asked her to "read this letter and . . .

---

[4]    Plaintiff claims that "[a]lthough workplace stress from my employment with CBI was expressed on multiple occasions[,] CBI failed to report [P]laintiff's injury in writing to the [Industrial Commission of Arizona] within 10 days of my written notification as required by law."  (Doc. 65 at 4.)

[5]    Plaintiff asserts that this fact is disputed: "Contrary to Defendant's submission . . . Ms. Waller did responded [sic] to Plaintiff's email."  (*Id.* at 4.)  This fact is not actually disputed because CBI did not assert that Waller never responded to Plaintiff's email; it just did not include the response in its exhibits.

1  [l]et me know when you will be coming back to work since I will need to reactivate your

2  account.  You can come back earlier from this leave of absence and if you require more

3  time out on a leave of absence, please let me know this as well."  (*Id.* at 17.)

4      Still on November 10, 2020, CBI approved Plaintiff's medical leave of absence

5  ("MLOA") retroactive from November 3, 2020 through December 3, 2020.  (Doc. 43-7 at

6  2.)  CBI informed Plaintiff that it would be an "unpaid leave of absence and may be granted

7  for up to 30 days."  (*Id.*)  Plaintiff was also informed that "MLOA is not a job protected

8  leave."  (*Id.*)

9      On November 12, 2020, CBI notified Plaintiff that her STD benefits had been

10  cancelled.  (Doc. 1 at 10.)

11      On November 17, 2020, Plaintiff provided DaCosta and Metcalf with a doctor's

12  note excusing her absences from November 10, 2020 to November 24, 2020 because of

13  "illness or injury."  (Doc. 44 at 32, 37 [Stripes Primary Care doctor's note].)[6]  Plaintiff also

14  informed Da Costa and Metcalf that she could return to work on November 25, 2020.  (*Id.*)

15      On November 24, 2020, DaCosta responded that she was "glad to hear things have

16  improved" and that Plaintiff should "report to Cactus tomorrow.  We will have you

17  continue the focus on CCHP [Comprehensive Community Health Program] for the

18  remainder of this week."  (*Id.*)[7]  Later that day, Plaintiff emailed Steege to report that she

19  had suffered a transient ischemic attack ("TIA"), also known as a mini-stroke, three weeks

20  earlier.  (Doc. 44 at 33; Doc. 1 at 10.)  Plaintiff also reported that she construed DaCosta's

21  request to report to a new location (Cactus) as encouraging her to quit and part of a

22  continued pattern of harassment.  (Doc. 44 at 33.)  Plaintiff continued: "I do not think that

23  I can accommodate [DaCosta's] request [to work in person daily at the Cactus location]

24  and I will be asking my doctor to re-evaluate my return to work based on this new

25  information tomorrow."  (*Id.*)[8]

26  ─────────────

[6]      In a January 2021 email to Plaintiff, Metcalf stated that she received this information
27  on November 10, 2020.  (Doc. 62-1 at 37-38.)  This seeming date discrepancy is not
material to the analysis here.

[7]      CCHP is one of the CBI programs that Plaintiff oversaw.  (Doc. 65 at 8.)

28  [8]      Plaintiff also informed Steege that she would "seek legal assistance in terms of my

On November 25, 2020, instead of returning to work, Plaintiff "sent a note from [her] primary care physician stating that [her] leave was being extended until December 15, 2020." (Doc. 62-1 at 38 [Metcalf's email describing receipt of the note].)[9]  That same day, Metcalf reached out to Plaintiff: "We are aware that you may need a reasonable accommodation when coming back to work.  Can you please fill out the Application for Reasonable Accommodation being specific on what you need as an accommodation?  Please have your physician fill out the medical inquiry form for a reasonable accommodation as well." (Doc. 44 at 36.)

On December 2, 2020, after receiving no response, Metcalf attempted to follow up with Plaintiff about the reasonable accommodation form.  (*Id.* at 35.)

On December 10, 2020, after receiving no response, Metcalf again attempted to follow up with Plaintiff about the reasonable accommodation form.  (*Id.*)  That same day, Plaintiff replied that she had submitted the reasonable accommodation form to her doctor and had already provided CBI with a doctor's note.  (Doc. 62-1 at 26.)  Later that same day, Metcalf responded by again requesting additional information:

> The note . . . from the doctor you sent was on 11/25/2020 and it only says that you are under their care.  Is there another note that is more specific that I did not get?  We also need a specific accommodation request written in the "Application for Reasonable Accommodation under the ADA" form attached.  We will also need the physician to fill out the "Medical Inquiry Form for Reasonable Accommodation" that is attached as well.

(*Id.* at 25-26.)  Still later that same day, Plaintiff replied:

> The ADA does not require employers to request medical information after receiving a request for accommodation.  An employer only has the right to know if I have a substantially limiting medical impairment.  My PCP did not complete the forms you attached as he extended my leave.  This Monday he/she will be reviewing all my specialist information to determine if I can; 1) return to work.  2) return to work with a request for accommodation.  Or 3) if my leave will be extended based on information obtain from multiple

rights in Arizona and my benefits being cancelled without my consent as I need [to] utilize this resource." (*Id.*)

---

[9]     This doctor's note is not included in the record.

specialist [sic].  ***I have enough to deal with and I'm unsure why you keep harassing me during my medical leave regarding petty paperwork that is not a legal requirement***.  As always, I will keep my employer informed on my return to work status, when that time comes at this point next week.

(*Id.* at 25, emphasis added.)

On December 11, 2020, Plaintiff was approved for a personal leave of absence ("PLOA") retroactive to December 4, 2020 through February 2, 2021.  (Doc. 43-8 at 2; Doc. 62-1 at 30 ["The PLOA is due to your medical leave of absence expiring on 12/3/2020 and you requiring more time out."].)  Again, Plaintiff was informed that "PLOA is not a job protected leave."  (Doc. 43-8 at 2, emphasis omitted.)[10]

On December 15, 2020, Plaintiff "sent a note from [her] physician stating that [her] leave would be extended until January 11, 2021."  (Doc. 62-1 at 38 [Metcalf's email describing receipt of the note].)[11]

On December 17, 2020, Metcalf emailed Plaintiff "to schedule a Microsoft Teams meeting . . . to discuss the nature of your situation, so that CBI can determine the likelihood that you will be able to return to work with or without a reasonable accommodation" and proposed times on December 17, 2020 and December 21, 2020.  (*Id.* at 33-34.)  That same day, Plaintiff replied that she was only available "on the 29th and 30th."  (*Id.* at 33.)

On December 18, 2020, Metcalf asked if they could meet on December 29, 2020 at 2:00 pm.  (*Id.* at 32-33.)

On December 28, 2020, after receiving no response, Metcalf sent a follow-up email.  (*Id.* at 32.)

On January 4, 2021, Plaintiff, without acknowledging her disregard of Metcalf's earlier emails, replied: "As I informed you via my doctors note; I am scheduled to return to work on January 12, 2021.  I have a doctors appointment on January 11th to determine my return to work status.  I will continue to keep you informed of any updates and or

---

[10]    Plaintiff's MLOA and PLOA were not job protected because, at the time she took the leave, she "had not been employed at CBI for more than 12 months."  (Doc. 43 at 3.)

[11]    This doctor's note is not included in the record.

changes." (*Id.*)

On January 7, 2021, Metcalf sent a response email. (*Id.* at 37-38.) Among other things, this email summarized the parties' interactions since the start of Plaintiff's medical leave in November 2020. (*Id.*) Metcalf also reminded Plaintiff that:

> As I have explained, CBI needs you to send a description of your possible disability (i.e. the nature, severity, and duration of the possible disability), the activities that the possible disability limits, and the extent to which the possible disability limits your ability to perform those activities. CBI needs this information to engage with you in the interactive process under the [ADA], to verify the existence of a disability under the ADA, and to determine the likelihood that you will be able to return to work with or without a reasonable accommodation.
>
> Please provide that information in the attached document[.] If you consent in that form, CBI can reach out to your physician to obtain the information directly. Please provide this information by January 11, 2021, so that CBI can determine whether to extend your unpaid leave based on your doctor's appointment on January 11, 2021.

(*Id.* at 38-39.)

On January 11, 2021, Plaintiff sent a reply email. (*Id.* at 36-37.) First, Plaintiff listed the doctors' notes she had provided to CBI excusing her from work. (*Id.*) Then, Plaintiff explained that "in late November, I wanted to return to work against my PCP recommendations," but because of the change in her job location to Cactus, the "requirement of being in the office 5 days a week," "my continuing symptoms, and the fact that we had not received any blood work back[,] my PCP extended my leave and recommended that my health be my priority. Those blood results prompted several new appointments, specialist and procedures that had to be done and are still in process." (*Id.* at 37.) Plaintiff continued:

> I took the ADA form to my provider and he stated this was a form I complete but that at this time no definitive diagnosis has been made as he is coordinating my care with 7 additional providers. . . . Also, please be advised that I sent a[n] email and certified letter to Najjian Amistoso cc Teresa Steege requesting information on all my insurance policies and LTD [long term disability] information and only received back the LTD rider. I would like

- 10 -

the policy information for my STD and additionally purchased Unum insurance products as I am entitled to.  If you could see to it that I get that information, it would be helpful in filling [sic] my claim.  Lastly, regarding the meeting request[,] CBI fails to understand that I am tending to my health and well being.  In contrary to the organization's mission of treating others with human dignity and respect, I don't feel this is being reciprocated to me as an employee.

(*Id.*, capitalization omitted.)  Plaintiff also attached a new doctor's note excusing her from work until February 2, 2021.  (*Id.*)[12]

That same day, Plaintiff submitted her "Application for Reasonable Accommodation."  (Doc. 44 at 38-40.)  In response to the prompt asking how to modify her "job duties or work environment," Plaintiff wrote: "I am currently under the care of several specialist[s] with my PCP as coordinator.  At this time my PCP does not release me to return to work."  (*Id.* at 38.)  When asked to "[d]escribe the essential functions of your job that you are unable to perform based upon your disability," Plaintiff wrote "unknown at this time."  (*Id.* at 39.)  When asked to describe the "[n]ature of your disability (include[] or attach any information that will help us understand the nature of your disability and the limits it places upon your ability to perform the essential functions of your current job)," Plaintiff wrote: "diagnosis in process (cardiovascular disease, Diabetes, CNS [central nervous system] disease, fatty liver & IBS)."  (*Id.*)  Plaintiff also declined to grant CBI access to her medical records.  (*Id.*)  Finally, when asked to indicate the duration of the reasonable accommodation, Plaintiff wrote "unknown."  (*Id.* at 40.)

On January 12, 2021, Metcalf directed Plaintiff "to reach out to [email redacted] to get the information that you need for your [STD]" and asked if she "[had] an update on [her] return back" to work.  (Doc. 62-1 at 36.)  Plaintiff replied the next day: "[I]f I have any updates, I will let you know on January 22, 2021."  (*Id.*)[13]

On February 2, 2021, Plaintiff informed CBI that she would return to work on

---

[12]    This doctor's note is not included in the record.

[13]    In Plaintiff's EEOC complaint, she asserted that "[o]n January 20, 2021, [Plaintiff] emailed the Employee Benefits Specialist to follow up regarding her previous request for short-term disability and additional insurance policy information."  (Doc. 1 at 10.)

February 3, 2021.  (Doc. 1 at 10.)

Later that day, during a call with CBI's human resources department, Plaintiff was told that she "would not be required to return to work and instead would have a discussion [with human resources] via [T]eams on Wednesday, February 3, 2021."  (Doc. 62-1 at 69.) During this same call, CBI informed Plaintiff that her position had been eliminated.  (Doc. 1 at 10.)  There was no discussion of Plaintiff's grievance.  (*Id.*)  As of February 2, 2021, Plaintiff had been on leave since November 2, 2021.  (Doc. 62-1 at 71.)[14]

On February 3, 2021, Plaintiff had a virtual meeting with Metcalf and Steege.  (Doc. 44 at 47.)  CBI offered Plaintiff an alternative job in an "Access to Care" position "that [she] could work at while looking for another internal position."  (*Id.*)  Metcalf described the job as "answering external phone calls from patients and clients who need help or may have questions regarding the services CBI offers.  This is considered light duty as it is just answering phone calls and typing on the computer."  (*Id.*)  Metcalf also noted that "CBI will pay you the same rate you were at while working temporarily [in the Access to Care position]."  (*Id.*)  According to CBI's official job description, the Access to Care position is generally suited for people currently in recovery and only requires a high school diploma or general educational development ("GED") degree.  (*Id.* at 44-45.)

On February 5, 2021, Plaintiff declined the position, stating in relevant part:

> CBI has failed to reinstate my employment after an approved [MLOA], by stating that I could not return to work until we had a conversation.  The position being offered to me is a demotion and in no way comparable to the position I held prior to my leave.  Lastly, the requirement of having me reapply for any position within the organization is egregious.  I am declining the position being offered by CBI as a call representative for the 800 access to care hotline as stated for only 30 days.  In no way is this position acceptable given the significant financial impact this will have on me and there are certainly other like positions available—not to mention I am able to

---

[14]    Plaintiff asserts she was "on medical leave since November 2, 2020" (Doc. 62-1 at 36), whereas CBI asserts that "Plaintiff took her first medical leave of absence on November 3, 2020" (Doc. 62 at 2).  This distinction is not relevant for summary judgment purposes—although Plaintiff did not attend work on November 2, 2020 (Doc. 43-9 at 2 [doctor's note excusing Plaintiff's absence on November 2, 2020]), her MLOA did not officially begin until November 3, 2020 (Doc. 43-7 at 2).

do my current position.  This is clearly ongoing discrimination/retaliation.

(Doc. 62-1 at 69.)[15]

In April 2021, the Arizona Department of Economic Security ("DES") denied Plaintiff's application for unemployment benefits because she "did not provide proper notice to [her] employer of [her] absence from work."  (Doc. 44 at 53.)[16]

CBI contends the elimination of Plaintiff's position was the result of a business restructuring, under the direction of new executive leadership, that began no later than September 2020.  (Doc. 43-12 ¶ 7 ["The restructuring process for the [Housing and Community Integration] Department began no later than September of 2020, before Plaintiff ever complained to CBI about any alleged violations under Title VII or the [ADA]."]; *id.* ¶ 4 ["CBI did not assign or hire anyone to fill Plaintiff's position.  Rather, CBI merged Plaintiff's duties into another position in a different department at CBI with someone who already had oversight over Medicaid-funded programs."]; Doc. 62-1 at 60 [November 2, 2020 email: "Effective 11/15/2020, the SMI PSH [Seriously Mentally Ill Permanent Supportive Housing] program will be transitioning from the Housing and Community Integration leadership to the SMI program"]; *id.* at 62 [December 9, 2020 email: "Effective 12/21/2020 the CCHP program will transition from the Housing and Community Integration leadership to the Clinical program"].)  However, on October 1, 2021, Plaintiff discovered that CBI was using Indeed.com to solicit applicants for the position of "Associate Director of Housing & Community Integration," which is Plaintiff's former job title.  (Doc. 44 at 55-56.)

III.   Procedural History

On March 3, 2021, Plaintiff filed a charge of discrimination with the EEOC, checking boxes to indicate that she had suffered discrimination on the basis of national origin, retaliation, and disability.  (Doc. 1 at 9-12.)

---

[15]     On February 25, 2021, CBI offered Plaintiff "2 weeks severance."  (Doc. 44 at 51.)

[16]     In her response brief, Plaintiff asserts that she successfully appealed the denial and was "awarded 14 weeks of unemployment benefits at a rate of $240 per week."  (Doc. 65 at 7.)

On May 5, 2021, the EEOC issued Plaintiff a "Notice of Right to Sue."  (*Id.* at 14.)

On July 28, 2021, Plaintiff initiated this action by filing the complaint, which included both the EEOC charge and the right-to-sue letter as attachments.  (Doc. 1.)  In her complaint, using pre-printed check boxes, Plaintiff identified her claims as falling under Title VII and the ADA.  (*Id.* at 3.)  Using other pre-printed checkboxes, Plaintiff alleged three categories of discriminatory conduct: termination, failure to accommodate her disability, and retaliation.  (*Id.* at 4.)  Using still other pre-printed checkboxes, Plaintiff alleged that CBI had discriminated against her based on her race, religion, national origin, and disability.  (*Id.*)

On November 21, 2022, CBI filed a motion for summary judgment.  (Doc. 43.)  That motion later became fully briefed.  (Docs. 44, 47.)

On August 2, 2023, the Court granted CBI's motion for summary judgment on all but two of Plaintiff's claims.  (Doc. 59.)  First, the Court granted CBI's motion for summary judgment on Plaintiff's claim of racial discrimination under Title VII because "Plaintiff did not identify herself as non-white" and "[e]ven construed with the utmost liberality, Plaintiff's EEOC charge was insufficient to exhaust any claim of race discrimination under Title VII."  (*Id.* at 15.)

Second, the Court concluded that CBI was not entitled to summary judgment on Plaintiff's two claims for disability discrimination in violation of the ADA—termination because of a disability and failure to accommodate.  (*Id.* at 18-29.)  As for the termination claim, the Court concluded that "Plaintiff has met her prima facie burden" because viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that CBI regarded her as disabled and that she suffered an adverse employment action—CBI eliminating her position and effectively terminating her—because of her disability given the temporal proximity between CBI learning of Plaintiff's disability and her termination.  (*Id.* at 20-25, emphasis omitted.)  Then, applying the *McDonnell Douglas* burden-shifting framework, the Court concluded that (1) "CBI has met its burden of production" to show a non-discriminatory explanation for eliminating Plaintiff's position, by offering evidence

that it resulted from business restructuring "already underway before Plaintiff sent her October 1, 2020 email or made any of the other relevant disclosures"; but (2) "[v]iewing the evidence in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to whether CBI's proffered reason for terminating Plaintiff (*i.e.*, her position was eliminated as part of a business restructuring) is pretextual."  (*Id.* at 25-27, cleaned up.)  As for the failure to accommodate claim, the Court interpreted "CBI's motion as challenging only whether Plaintiff made a disclosure of the nature of her impairment" and determined that "a reasonable juror could conclude that she did."  (*Id.* at 28-29.)  The Court acknowledged "the limited nature of the conclusion being reached" and that "CBI may very well prevail on" an alternative ground for summary judgment at a later stage.  (*Id.*)

Third, the Court granted CBI's request for summary judgment on Plaintiff's claim of religious discrimination under Title VII because "Plaintiff lacks evidence of an adverse employment action in relation to that claim" other than, potentially, her termination, which was too temporally attenuated from the alleged act of religious discrimination to create an inference of causation.  (*Id.* at 29-32.)

Fourth, the Court granted CBI's request for summary judgment on Plaintiff's claim of national-origin discrimination under Title VII because "Plaintiff has made no attempt to factually identify what adverse action was taken in relation to her national origin or show that the action was taken because of her national origin."  (*Id.* at 32-33, footnote omitted.)

Fifth, the Court granted "CBI's request for summary judgment as to any hostile work environment claim" because (1) Plaintiff "overwhelmingly focuses on the behavior of her terminated subordinate" and "the terminated subordinate's behavior is not properly before the Court because it went unexhausted before the EEOC and is not factually supported here"; (2) "[a]s for the conduct of DaCosta, even under a liberal construction of Plaintiff's briefing, together with the theories put forward in her EEOC charge and her complaint, Plaintiff has neither alleged nor demonstrated that DaCosta's conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive work environment"; and (3) "Plaintiff has not articulated how DaCosta's

statements relate to a protected characteristic."  (*Id.* at 33-35, cleaned up.)

Sixth, the Court concluded that Plaintiff could not establish a prima facie case of retaliation under Title VII because she did not engage in a protected activity—"the actual conduct Plaintiff described in [her October 1, 2020 email] is unrelated to any 'unlawful employment practice' prohibited by Title VII [so] . . . the [email] could not have qualified as a protected activity."  (*Id.* at 35-37.)[17]

Seventh, the Court concluded that, because "the only remaining claims in this case are Plaintiff's ADA claims (termination and failure to provide a reasonable accommodation)," and "[s]uch claims may only be brought against CBI and may not be brought against individual supervisors such as DaCosta," "Plaintiff was not required, under *Iqbal*, to meet some additional 'vicarious liability' pleading hurdle before being allowed to assert such claims against CBI . . . [and] it does not appear that the *Ellerth/Faragher* defense applies to such claims, which are not premised on the existence of a hostile work environment and turn, at least in part, on Plaintiff's contention that she was subjected to tangible employment actions."  (*Id.* at 38-40, citations omitted.)

Finally, because "Plaintiff's claims and evidence have proved to be a bit of a moving target, which greatly complicated CBI's task of establishing an entitlement to relief under Rule 56," the Court authorized CBI to file a renewed motion for summary judgment as to Plaintiff's remaining ADA claims.  (*Id.* at 40-41.)

On August 24, 2023, CBI filed the pending renewed motion for summary judgment. (Doc. 62.)

On October 5, 2023, CBI filed a motion for summary disposition.  (Doc. 63.)  CBI sought summary disposition "because Plaintiff failed to file a response by her deadline of September 28, 2023."  (*Id.* at 1.)

On October 10, 2023, Plaintiff filed a response to the summary judgment motion. (Doc. 65.)  Plaintiff disputed whether she had been properly served with the motion.  (*Id.*

---

[17]   The Court also acknowledged that "[a]lthough it is possible to assert a retaliation claim under the ADA, Plaintiff has not asserted one here."  (*Id.* at 37 n.17.)

1    at 1-2.)

2         On October 11, 2023, the Court denied CBI's motion for summary disposition.

3    (Doc. 64.)  The Court noted that "summary judgment cannot be granted by default even if

4    there is a complete failure to respond to the motion. . . .  Instead, in the summary judgment

5    context, the opposing party's failure to respond to a fact asserted in a summary judgment

6    motion merely permits a court to consider the fact undisputed for purposes of the motion."

7    (*Id.* at 1, cleaned up.)

8         Later that same day, the Court noted that "Plaintiff has submitted a response to the

9    motion for summary disposition, which was not docketed or viewed by the Court until after

10   the Court denied the motion for summary disposition.  The response is construed as a

11   request for an extension of time to respond to Defendant's motion for summary judgment

12   and a proposed response to that motion.  This request is granted."  (Doc. 66, internal

13   citations omitted.)

14        The renewed motion for summary judgment is now fully briefed.  (Docs. 65, 67.)[18]

15                                  **DISCUSSION**

16   I.   <u>Legal Standard</u>

17        "The court shall grant summary judgment if [a] movant shows that there is no

18   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

19   of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of

20   the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

21   in the non-movant's favor."  *Fresno Motors*, 771 F.3d at 1125.  The court "must view the

22   evidence in the light most favorable to the nonmoving party and draw all reasonable

23   inference in the nonmoving party's favor."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459

24   (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may

25   reasonably be drawn from the undisputed facts."  *Fresno Motors*, 771 F.3d at 1125 (internal

26   quotation marks omitted).

27   
─────────────────────

28   [18]    CBI's request for oral argument is denied because the issues are fully briefed and
     oral argument will not aid the decisional process.  *See* LRCiv 7.2(f).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). At the same time, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

Although Plaintiff is pro se, "litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record." *Jacobsen v. Filler*, 790 F.2d 1362, 1364 (9th Cir. 1986). "The Ninth Circuit directs courts 'to make reasonable allowances for pro se litigants and to read pro se papers liberally.'" *Wilson v. JPMorgan Chase, N.A.*, 2020 WL 6262106, *2 (W.D. Wash. 2020) (quoting M*cCabe v. Arave*, 827 F.2d 634, 640

n.6 (9th Cir. 1987)).  However, "district courts lack 'the power to act as a party's lawyer, even for *pro se* litigants.'"  *Id.* (quoting *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007)).  *See also Bias*, 508 F.3d at 1219 ("[Plaintiff] maintains . . . that as a *pro se* litigant the district court should have searched the entire record to discover whether there was any evidence that supports her claims.  We disagree.  A district court does not have a duty to search for evidence that would create a factual dispute.").

II.     The Americans With Disabilities Act

       "To state a prima facie case under the ADA, [a plaintiff] must show (1) that she is disabled within the meaning of the ADA; (2) that she is a qualified individual with a disability; and (3) that she was discriminated against because of her disability."  *Smith v. Clark Cnty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013).

       A.     **Disabled Within The Meaning Of The ADA**

              1.     The Parties' Arguments

       CBI argues that Plaintiff cannot establish she was disabled under the ADA.  (Doc. 62 at 7-11.)  First, CBI argues that Plaintiff cannot show that she had an impairment that substantially limited a major life activity because (1) "during her deposition in this matter, Plaintiff repeatedly dodged questions and failed to identify what her disability is/was"; and (2) "she failed to provide CBI with any medical records or medical expert opinions specifically identifying and/or describing her disability and specifically explaining how any such limitation impacted her ability to perform her job."  (*Id.* at 8-9.)  Second, CBI makes a similar argument in the section of its brief entitled "Plaintiff Cannot Establish a 'Record of Impairment,'" asserting that "Plaintiff cannot show a 'record of impairment' because she repeatedly failed to provide CBI with information to show that her purported medical conditions 'substantially limited' one or more major life activities."  (*Id.* at 9.)  Third, CBI argues that because "there is no evidence that CBI had sufficient information about Plaintiff's purported medical conditions to form a correct (or even mistaken) perception that Plaintiff was actually disabled under the ADA" and "[b]ecause Plaintiff failed to explain how her purported medical conditions 'substantially limited' her major

1  life activities, there is no factual basis for Plaintiff to establish that CBI could have ever

2  'regarded her' as having an actual impairment under the ADA." (*Id.* at 9-10.)

3       In response, Plaintiff asserts that she "notified CBI of her fatty liver disease and IBS

4  at her interview, notified CBI of her TIA mini-stroke, hbp-high blood pressure, type II

5  diabetes, CNS disease and on-going testing and medical appointments to her PCP,

6  neurologist and GI specialists during her multiple phone conversations with Melissa

7  Metcalf (HR)." (Doc. 65 at 5.) Plaintiff also asserts that, "[i]n contrast to Defendant's

8  counsel suggesting that Plaintiff during her deposition admitted to not having any medical

9  issues[,] Plaintiff has undergone continuous medical evaluations and medical diagnosis for

10  the past three years since the medical episode that occurred at CBI on October 30, 2020 as

11  the precursor." (*Id.* at 9.)

12       In reply, CBI contends that "Plaintiff has not offered any admissible evidence to

13  meet any of [the] three possible definitions" of disability under the ADA. (Doc. 67 at 3.)

14  CBI then elaborates upon some of the arguments raised in its motion. (*Id.* at 3-4.)

15                      2.  <u>Analysis</u>

16       Under the ADA, "disability" is defined as "(A) a physical or mental impairment that

17  substantially limits one or more major life activities of such individual; (B) a record of such

18  an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.

19  § 12102(1). "[A] person need fit only one of the three definitions to be disabled for the

20  purposes of the ADA." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1153 (9th Cir.

21  1997). Because, as discussed below, the Court concludes that Plaintiff has come forward

22  with sufficient evidence to create a genuine issue of fact as to the third definition, it is

23  unnecessary to address the other two definitions.

24       One of CBI's arguments concerning the "regarded as" prong is that "[b]ecause

25  Plaintiff failed to explain how her purported medical conditions 'substantially limited' her

26  major life activities, there is no factual basis for Plaintiff to establish that CBI could have

27  ever 'regarded her' as having an actual impairment under the ADA." (Doc. 62 at 10.) The

28  problem with this argument is that it is premised on the pre-2008 version of the ADA.

*EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 922 (9th Cir. 2018) (describing the pre-2008 version of the ADA as requiring that "an impairment had to substantially limit a major life activity for the discrimination to be actionable under the 'regarded as' prong").   The 2008 amendments to the ADA lowered the standard for qualifying as disabled under the "regarded as" prong:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A).   *See also BNSF Ry. Co.*, 902 F.3d at 924 ("The ADA no longer requires a showing of a substantially limiting impairment, following the 2008 enactment of the ADAAA.").   "In regarded-as cases, thus, a plaintiff must show that the employer knew that the employee had an actual impairment or perceived the employee to have an impairment, and that the impairment was not transitory or minor."   *BNSF Ry. Co.*, 902 F.3d at 923.   *See also Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 434 (9th Cir. 2018) (defining transitory as "expected to last six months or less").

CBI also contends it could not have regarded Plaintiff as disabled because she "merely listed a few medical conditions in her Request for Accommodation," "never provided CBI with any information about the nature, severity, or anticipated duration of those conditions," "continually refused to provide CBI with details about her conditions," "never actually requested any specific accommodation," "completely failed to indicate what aspects of her job she was unable to perform," and suggested that "her own doctors . . . did not yet know whether she was disabled."   (Doc. 62 at 9-10.)   Although these arguments present a close call, a reasonable jury could still conclude—when all reasonable inferences are resolved in Plaintiff's favor—that CBI regarded her as having an impairment.   On multiple occasions over a span of 11 months, Plaintiff stated or intimated to CBI that she had fatty liver disease, IBS, cardiovascular disease, diabetes, CNS disease, and/or a TIA/mini-stroke.   (Doc. 62-1 at 51 ["I do have fatty liver.  I had that prior.  I had

IBS prior.   And CBI was aware of that because that was listed in my interview documents."]; Doc. 44 at 24 [November 5, 2020 email: "I have spent two days in ER for high blood pressure and pre-stroke symptoms"]; *id.* at 33 [November 24, 2020 email: "I had a TIA/mini-stroke and I'm only three weeks out"]; *id.* at 38-39 [January 11, 2021 reasonable accommodation request, claiming "diagnosis in process" for "cardiovascular disease, Diabetes, CNS disease, fatty liver & IBS"].)[19]   CBI was also aware that Plaintiff needed to take an extended medical leave because of her claimed health issues.   (Doc. 43-11 at 2 [November 10, 2020 email: "I am unable to return to work at this time due to health reasons"]; Doc. 62-1 at 14 [November 10, 2020 email: "I would like to request a medical leave of absence . . . ."]; *id.* at 71 [Plaintiff did not work from November 2, 2020 through February 2, 2021]; *id.* at 38 [email from Metcalf: "[Y]ou informed your supervisor that you were unable to [return to work] because of the distance you would have to drive"].)   Additionally, members of CBI's human resources department expressed sympathy to Plaintiff regarding her "health struggles."   (*See, e.g.*, Doc. 65 at 15 [Waller: "I am sorry to hear of your health struggles.   We want you to focus on your recovery . . . .   I am wishing you a speedy recovery"].)   The Ninth Circuit has stated that these sorts of details are sufficient to create a genuine issue of fact at summary judgment in "regarded as" cases.   *Baker v. Roman Cath. Archdiocese of San Diego*, 725 F. App'x 531, 532 (9th Cir. 2018) ("Here, there is evidence in the summary judgment record that the principal Michael Deely: (1) knew that Baker had suffered a concussion at the end of August, because she had told him via email; (2) knew that Baker continued to suffer from dizziness and headaches after

---

[19]      It should be noted that Plaintiff's statements to CBI concerning her claimed impairments were not always consistent.   For example, on November 5, 2020, Plaintiff stated in an email to CBI that her "only medical conditions are IBS and fatty liver none of which is what I am dealing with now."   (Doc. 44 at 20-25.)   Similarly, during her deposition in this case, Plaintiff conceded that her fatty liver disease and IBS were "pretty much controlled" when she worked for CBI.   (Doc. 62-1 at 54.)   And in her response brief, Plaintiff asserts that "[p]rior to the medical treatment sought [on] October 30, 2020 and thereafter Plaintiff had no previous medical history nor been diagnosed with high blood pressure or type II diabetes."   (Doc. 65 at 8.)   Nevertheless, when all factual disputes are resolved in Plaintiff's favor, and in light of the post-2008 rule that an employer can still regard an employee as impaired even if the impairment does not substantially limit major life activities, *BNSF Ry. Co.*, 902 F.3d at 924, a reasonable juror could still find that Plaintiff repeatedly disclosed the existence of impairments to CBI.

the concussion, because Baker said she told him that when she ran into him every week or two; (3) was concerned about Baker's health immediately after the concussion, because he expressed that concern to her; and (4) according to both Baker and Deely, asked about Baker's health when he saw her from time to time.  This evidence could be interpreted by a jury as demonstrating that Deely 'regarded' Baker as having post-concussion headaches and dizziness throughout the relevant time period.").

Further evidence supporting Plaintiff's position is that CBI repeatedly accommodated her claimed impairments by granting her MLOA and PLOA for her health issues.  (Doc. 43-7 at 2 [MLOA]; Doc. 43-8 at 2 [PLOA].)   Plaintiff also requested information on and/or paid for disability benefits, like STD, LTD, and insurance with Unum.  (Doc. 43-3 at 2 ["CBI withdrew only one payment for short-term disability from Plaintiff's paychecks."]; Doc. 62-1 at 37 [reference to LTD benefits]; *id.* [reference to Plaintiff's Unum insurance].)   Although providing such accommodations alone cannot create a genuine dispute of fact as to whether CBI regarded Plaintiff as having an impairment, *Tsuji v. Kamehameha Sch.*, 154 F. Supp. 3d 964, 975 n.10 (D. Haw. 2015), *aff'd*, 678 F. App'x 552 (9th Cir. 2017), they add further support when considered together with the evidence discussed above.

The lack of medical documentation supporting Plaintiff's claimed impairments and CBI's unfulfilled requests for medical documentation do not undermine that conclusion.  To be clear, a lack of medical documentation may undermine a "regarded as" claim under some circumstances.  *See, e.g.*, *Sutter v. Shriners Hosps. For Child.*, 2023 WL 5275496, *5 (D. Or. 2023) ("Here, the record at most supports a finding that Defendant Shriners was trying to understand Plaintiff's stress surrounding the performance of her duties.  It does not support a finding that Defendant regarded Plaintiff as disabled.  Plaintiff's doctor's notes stated that she suffered stress and anxiety from performing her payroll duties.  They do not state that she was disabled or that she had an underlying condition that caused stress and anxiety or made her more susceptible to stress and anxiety.  There is no evidence that Plaintiff informed Defendant of any such condition or that Defendant otherwise perceived

such a condition.  There is no evidence that Plaintiff did more than present the doctor's notes and tell Defendant that she wanted to be removed from payroll duties.  Defendant then discussed this with her.  Holding a conversation about ways to manage work-related stress and anxiety and considering possible accommodations is not, on its own, enough to support the inference that Defendant viewed Plaintiff as disabled."); *Heit v. Aerotek Inc.*, 2016 WL 6298771, *4 (W.D. Wash. 2016), *aff'd*, 726 F. App'x 658 (9th Cir. 2018) ("[T]he record does not support a finding that Aerotek regarded or perceived Mr. Heit as having paruresis.  Quite the opposite, in fact, as it requested further documentation from Mr. Heit in order to establish his alleged disability.  Without more, Mr. Heit's claim that he has 'shy bladder syndrome' amounts to self-diagnosis, and is insufficient as a matter of law for his claim to go forward under the ADA or WLAD.").  Nevertheless, as noted, the Ninth Circuit has concluded that a plaintiff may survive summary judgment under a "regarded as" theory even if, as here, the employer was not provided with medical documentation of the claimed impairment.  *Baker*, 725 F. App'x at 532-33 (reversing grant of summary judgment where plaintiff's subjective complaints of symptoms, coupled with expression of concern and sympathy from the employer, raised "a triable dispute as to whether RCBSD regarded Baker as disabled").

### B.     Discrimination Because Of A Disability

As noted, the third element of an ADA claim is that the plaintiff "was discriminated against because of her disability."  *Smith,* 727 F.3d at 955.[20]  Plaintiff asserts two theories of discrimination here: (1) unlawful termination; and (2) failure to accommodate.

#### 1.     Termination

#### a.     The Parties' Arguments

As a threshold matter, CBI argues that it "did not terminate Plaintiff's employment.  Instead, Plaintiff resigned."  (Doc. 62 at 6.)  Alternatively, CBI argues that "[b]ecause CBI

---

[20]     The second element of an ADA claim is that the plaintiff "is a qualified individual with a disability."  *Id.*  Because CBI does not move for summary judgment on that element, instead choosing to focus on the first and third elements, the Court follows the same approach here.

- 24 -

never perceived Plaintiff as actually disabled, CBI's decision to eliminate her position could not have been motivated by disability discrimination." (*Id.* at 11.) Further alternatively, CBI argues that even if it perceived Plaintiff as disabled, "Plaintiff's only proffered evidence of discriminatory animus is the alleged temporal proximity between the time she claims she put CBI on notice of a disability on October 31, 2020, and the date that her position was eliminated on February 2, 2021" and "no reasonable juror could find that CBI discriminated against Plaintiff based on temporal proximity alone, particularly when the gap . . . was more than two months." (*Id.* at 11-12, cleaned up.) CBI also argues Plaintiff cannot establish causation because "Plaintiff admitted during her deposition that at least two of the conditions she listed on her Request for Accommodation were disclosed to CBI at the outset of her employment in March of 2020," meaning "almost an entire year passed between the date that Plaintiff first informed CBI about at least two of her purported medical conditions and the date that her position was eliminated." (*Id.* at 12.)[21]

In response, Plaintiff asserts that "CBI took an adverse employment action against [her] due to her perceived physical and/or mental impairment." (Doc. 65 at 6.) Elsewhere, Plaintiff adds: "Plaintiffs [sic] disability led to an adverse employment action as . . . per [CBI's] own submission to the State of Arizona Unemployment [that CBI] terminated Plaintiff due to excessive absenteeism during the approved medical/personal leave." (*Id.* at 9.)

In reply, CBI essentially reiterates some of the arguments from the renewed motion for summary judgment, specifically that (1) because CBI did not perceive Plaintiff as disabled, CBI did not terminate her because of her disability; and (2) even if CBI did perceive Plaintiff as disabled, the timeframe between CBI first receiving notice of Plaintiff's disability in March 2020 and her termination in February 2021 was too long to support an inference of causation. (Doc. 67 at 6-7.)

---

[21]     CBI also offers arguments regarding the issues of a non-discriminatory explanation and pretext (*id.* at 13-14), and Plaintiff offers counterarguments as to those issues (Doc. 65 at 8, 10). It is unnecessary to reach those issues here in light of CBI's entitlement to summary judgment on other grounds.

b.   **Analysis**

The Court already addressed and rejected CBI's threshold argument, that Plaintiff was not terminated and thus did not suffer an adverse employment action, in the earlier summary judgment order.   (Doc. 59 at 22, citation omitted ["Plaintiff has proffered sufficient evidence of an adverse employment action. . . .   CBI's elimination of Plaintiff's position and offer of a less desirable replacement position (which Plaintiff chose to reject due to its undesirability) qualifies as an adverse action."].)[22]

Turning to the issue of causation, it is not enough to show "that a disability was a motivating factor of the adverse employment action."   *Murray v. Mayo Clinic*, 934 F.3d 1105 (9th Cir. 2019).   Instead, "ADA discrimination claims under Title I must be evaluated under a but-for causation standard."   *Id.* at 1107.

Here, there is no direct evidence that CBI's decision to eliminate Plaintiff's position—and, thus, effectively terminate Plaintiff—was motivated by Plaintiff's disability (actual or perceived).   "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption."   *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 662 (9th Cir. 2002), *as amended* (July 18, 2002) (cleaned up). Here, both sides' contemporaneous notes reflect that CBI did not indicate that Plaintiff's health conditions or health-related absenteeism had anything to do with CBI's challenged employment actions.   Rather, CBI simply told Plaintiff that her old position had been eliminated and then offered her a different position, which she refused.   (Doc. 62-1 at 67 [Metcalf's February 3, 2021 "CBI Meeting Summary" email: "Due to your position being eliminated we have some interim Access to Care positions open that you could work at while looking for another internal position."]; *id.* at 69 [Plaintiff's February 5, 2021 response email: "During our conversation you expressed the information described in your

_____

[22]      *See generally Nunies*, 908 F.3d at 431 (treating the elimination of an employee's job as termination); *Voschin v. Bd. of Cnty. Comm'rs of Miami-Dade Cnty.*, 2012 WL 1792336, *3 n.6 (S.D. Fla. 2012) ("[T]he Court will proceed with its analysis under the presumption that Plaintiff Voschin was terminated, because Defendant County had notified Plaintiff Voschin of the elimination of her position and gave notice of her effective termination date prior to the resignation decision.").

email. . . .  The position being offered is that of a entry level position at access to care which is not comparable to the position I held in any way. . . .  I am declining the position being offered by CBI . . . ."].)  Nothing in those descriptions qualifies as direct evidence of discriminatory intent.

Plaintiff also contends in her response brief that her "disability led to an adverse employment action as . . . per [CBI's] own submission to the State of Arizona Unemployment [that CBI] terminated Plaintiff due to excessive absenteeism during the approved medical/personal leave."  (Doc. 65 at 9.)  Even if this assertion is generously construed as an attempt to identify direct evidence of discriminatory animus, it fails to establish the intended purpose.  As noted in the statement of facts, Plaintiff applied for unemployment benefits after she stopped working for CBI.  After CBI opposed her claim, both sides had an opportunity to provide a statement to DES.  In her statement, Plaintiff did *not* contend that CBI admitted to having a discriminatory motive for the elimination of her position.  To the contrary, Plaintiff claimed that CBI did not offer an explanation for the decision: "On 2/3/2021, during that [Z]oom meeting I was informed my position as associate director had been eliminated *and no further information was offered*."  (Doc. 62-1 at 72, emphasis added.)  Likewise, the notes from the DES factfinding process suggest that CBI simply confirmed that Plaintiff's old position had been eliminated without explaining why.  (*Id.* at 72-73.)  Those notes also indicate that CBI stated that Plaintiff "voluntarily quit after refusing a suitable offer of work."  (*Id.* at 72.)  Once again, nothing in those descriptions qualifies as direct evidence of discriminatory intent.

The final piece of evidence in the summary judgment record concerning Plaintiff's application for unemployment benefits is DES's final (pre-appeal) decision denying her claim for benefits, in which DES wrote: "Your employment was terminated because you did not provide proper notice to your employer of your absence from work.  You were aware that notice was required.  You have not shown good cause for failing to provide notice as required by your employer.  Your actions were a disregard of your employer's interest."  (Doc. 44 at 53.)  This, too, fails to qualify as direct evidence of discriminatory

intent.  As an initial matter, the reference to Plaintiff's failure to "provide proper notice to your employer of your absence from work," when read in context of the parties' earlier statements to DES, likely refers to Plaintiff's refusal to show up to work for the new position she was offered.  But even assuming for the sake of argument that it might refer to earlier conduct, no reasonable juror could construe it as suggesting that CBI eliminated Plaintiff's position because of her earlier health-related *absenteeism*—rather, the concern arose from Plaintiff's failure to provide "proper *notice*" of her absences.  Faulting an employee for violating notice requirements is not direct evidence of disability discrimination.[23]

Thus, as in the previous summary judgment order, the Court construes Plaintiff's brief as arguing that such animus may be inferred from the temporal proximity between her disclosures regarding her medical conditions and her termination.  *Cf. Anderson v. City & Cnty. of San Francisco*, 169 F. Supp. 3d 995, 1035 (N.D. Cal. 2016) ("Plaintiff is silent on the issue of causation.  The court will construe Plaintiff's causation evidence as being based solely on temporal proximity between the filing of her second EEOC charge in March 2012, and her non-selection for the 115th Fire Academy in July 2013.").  The Ninth Circuit has held that "in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.  But timing alone will not show causation in all cases; rather, 'in order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression.'"  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (cleaned up).  *See also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("[T]emporal proximity must be 'very close.'") (citation omitted); *Hanson v. Or., Legis. Assembly*, 2023 WL 22196, *11 (D. Or. 2023) ("Temporal proximity between protected

---

[23]    This conclusion is not inconsistent with the passage in the earlier summary judgment order explaining that CBI's notice-based explanation to DES for the termination decision could be viewed, for purposes of later steps of the *McDonnell Douglas* analysis, as evidence that CBI's other proffered reason for the elimination of Plaintiff's position (*i.e.*, a business restructuring) was pretextual.  (Doc. 59 at 26-27.)  The point here is that none of CBI's proffered justifications constitute direct evidence of discriminatory animus.

activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of *retaliation* in some cases.  Courts in analyzing *discrimination* claims, however, also have considered close temporal proximity as evidence supporting whether discrimination was 'because of' (meaning 'but for') the protected characteristic, particularly in ADA and FMLA cases.") (cleaned up).

The relevant chronology is as follows.  Plaintiff first informed CBI of her fatty liver disease and IBS during her interview and application process in March 2020.  (Doc. 62-1 at 51; Doc. 65 at 5.)  On November 2, 2020, Plaintiff began her leave of absence from work.  (Doc. 43-9 at 2.)  On November 5, 2020, while still on leave, Plaintiff emailed CBI that although her "only medical conditions are IBS and fatty liver none of which is what I am dealing with now," she "[had] been enduring a very serious medical concern on set [sic] by stress from my employment with CBI," specifically that she had been in the ER because of her high blood pressure and pre-stroke symptoms.  (Doc. 44 at 20, 24-25.)  On November 17, 2020, Plaintiff emailed DaCosta and Metcalf that she would be able to return to work on November 25, 2020.  (*Id.* at 32.)  However, on November 24, 2020, after being told that her work location changed, Plaintiff informed CBI that she had a stroke/TIA three weeks earlier and that she planned to ask her doctor to reevaluate her return to work.  (*Id.* at 33.)  Next, on November 25, 2020, Plaintiff submitted a doctor's note extending her leave until December 15, 2020.  (Doc. 62-1 at 38.)[24]  On December 15, 2020, Plaintiff submitted another doctor's note extending her leave until January 11, 2021.  (*Id.*)  On January 11, 2021, Plaintiff submitted her reasonable accommodation application identifying her claimed impairments (Doc. 44 at 38-39) and another doctor's note extending her leave until February 2, 2021 (Doc. 62-1 at 37).  On February 2, 2021, Plaintiff informed CBI that she would return to work on February 3, 2021, and CBI informed Plaintiff that her position had been eliminated.  (Doc. 1 at 10.)  On February 3, 2021, CBI offered Plaintiff a temporary position in Access to Care, which Plaintiff declined

---

[24]    The email cross-referencing the November 25, 2020 doctor's note was not in the record at the time of the earlier summary judgment order.

on February 5, 2021.  (Doc. 44 at 47; Doc. 62-1 at 67.)

Given this backdrop, no reasonable juror could infer a causal connection between Plaintiff's disclosure of her impairments (which began in March 2020) and CBI's elimination of her position and purported constructive discharge in February 2021.  The 11-month gap was simply too long to create an inference of causation.  *Kadiyan v. Medtronic*, 2011 WL 13142145, *15 (C.D. Cal. 2011), *aff'd sub nom. Kadiyan v. Medtronic, Inc.*, 510 F. App'x 649 (9th Cir. 2013) ("The fact that Kadiyan was allegedly terminated six months after she informed her employer of her disability, standing alone, is thus insufficient to make out a prima facie case of disability discrimination.").  *See also Manatt v. Bank of Am., NA*, 339 F.3d 792, 802 (9th Cir. 2003) (concluding that a causal "inference is not possible in this case because approximately nine months lapsed between the date of Manatt's complaint and the Bank's alleged adverse decisions") (citations omitted).[25]

Plaintiff's statement regarding her fatty liver disease and IBS in her November 5, 2020 email does not undermine this conclusion, as she simultaneously informed CBI in that email of two new health conditions that were keeping her out of work.  Indeed, Plaintiff's theory is that her disclosures on November 5, 2020 simply added to CBI's existing knowledge of her alleged disabilities.  (Doc. 65 at 9 ["Plaintiff informed CBI of her fatty liver disease and IBS prior to employment.  During her medical leave from work

---

[25]   In the earlier summary judgment order, the Court concluded, based on the underdeveloped record before it at the time, that "[a] reasonable juror could infer from this chronology that the Plaintiff's email of November 17, 2020 indicated that she was no longer disabled; that Plaintiff's email of November 24, 2020, although ambiguous due to its reference to 'asking [Plaintiff's] doctor to re-evaluate [her] return to work,' did not constitute a renewed claim of disability but rather reflected Plaintiff's dissatisfaction with the plan to change her work location; and that Plaintiff did not effectively reassert a disability until January 11, 2021, when she formally submitted the reasonable accommodation request." (Doc. 59 at 24, alterations in original.)  Given this chronology, the Court concluded that a reasonable juror could make a causal inference due to the temporal proximity between Plaintiff's reassertion of her disability in January 2021 and Plaintiff's termination in February 2021, or alternatively between Plaintiff's November 24, 2020 email and her February 2021 termination.  (*Id.* at 23-25.)  The analysis here is different due to CBI's submission of important new evidence that was not previously part of the record—the evidence that Plaintiff sent a doctor's note on November 25, 2020 extending her uninterrupted medical leave.  (Doc. 62-1 at 38.)  This additional evidence fills the temporal gap that existed in the previous record.

1   Plaintiff inform CBI of new diagnosis of TIA mini stroke, hbp-high blood pressure,
2   diabetes and CNS disease all disabilities aforementioned are covered under ADA."].)

3          Nor does Plaintiff's November 17, 2020 email, which included a request to return
4   to work on November 25, 2020, alter the causation analysis.  That email only indicated
5   when Plaintiff would be able to return to work, November 25, 2020, not that she was able
6   to return to work on November 17, 2020.  Because Plaintiff's doctor extended her leave on
7   November 25, 2020 and twice again after that (through February 2, 2021), CBI continued
8   to regard Plaintiff as impaired throughout that period.

9                      2.   <u>Reasonable Accommodation</u>

10                     a.   **The Parties' Arguments**

11         CBI argues that "Plaintiff cannot prevail on an accommodation claim because she
12  was not actually disabled, she was not perceived as disabled, and she failed to engage in
13  the interactive process in good faith."  (Doc. 62 at 15.)  Specifically, CBI argues that
14  "Plaintiff never actually requested any specific accommodation" and "repeatedly failed
15  and/or refused to provide CBI with sufficient information to determine whether she was
16  actually disabled, and if so, whether she actually needed an accommodation."  (*Id.* at 10,
17  12.)  CBI also argues that "even if it were assumed, for the sake of argument only, that
18  Plaintiff could show that CBI 'regarded' her as disabled, this would not be a valid legal
19  basis to establish an accommodation claim."  (*Id.* at 17.)[26]

20         Unfortunately, Plaintiff's response brief offers only a cursory defense of her failure
21  to accommodate claim.  Plaintiff asserts that CBI was aware of her disabilities, "fatty liver
22  disease and IBS[,] . . . TIA mini-stroke, hbp-high blood pressure, type II diabetes, CNS
23  disease," that she "was responsible in providing her employer with information as obtained
24  by medical professionals," and that she "continuously provided . . . CBI with on-going

---

25  [26]        CBI is correct that "there is no duty to accommodate an employee in an 'as regarded'
26  case."  *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1233 (9th Cir. 2003).  Thus, if
    Plaintiff's failure-to-accommodate evidence were otherwise sufficient to survive summary
27  judgment, it might be necessary to expand the analysis in Part II.A.2 to address the
    sufficiency of Plaintiff's evidence under the first prong of the "disability" definition.  But
28  because, as discussed below, Plaintiff's failure-to-accommodate evidence fails for other
    reasons, there is no need to expand Part II.A.2.

medical documentation and status of her illness and diagnosis." (Doc. 65 at 5, 9.) Plaintiff then asserts that her "disability led to an adverse employment action as CBI never discussed reasonable accommodations." (*Id.* at 9.)[27]

In reply, CBI essentially reiterates the arguments from its renewed summary judgment motion: (1) Plaintiff "cannot show that she was ever actually disabled"; and (2) even if she could, "she cannot show that CBI failed to accommodate her, because she failed to cooperate with CBI during the interactive process." (Doc. 67 at 4.) CBI then elaborates upon the arguments raised in its motion. (*Id.* at 5-6.)

b.    **Analysis**

An employer engages in unlawful discrimination in violation of the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). *See generally Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) ("The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business.").

"The Ninth Circuit has held that notifying an employer of a need for an accommodation triggers a duty to engage in an 'interactive process' through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee." *Snapp*, 889 F.3d at 1095. "The interactive process requires *both* the employer *and* the employee to engage in good faith in order to clarify

---

[27]    Plaintiff also offers arguments regarding the issues of retaliation and vicarious liability. (*Id.* at 9-11.) It is unnecessary to address those arguments here because the Court already granted summary judgment to CBI as to Plaintiff's retaliation and vicarious liability claims. (Doc. 59 at 35-41.)

what the individual needs and identify the appropriate accommodation." *Goos v. Shell Oil Co.*, 451 F. App'x 700, 702 (9th Cir. 2011) (internal quotation marks and citation omitted, emphasis in original). *See also id.* (the employee's participation is "important" because the employee "generally knows more about his or her capabilities, and 'holds essential information for the assessment of the type of reasonable accommodation which would be most effective'") (citation omitted). Thus, "an employer does not have a duty under the ADA . . . to engage in further interactive processes . . . in the absence of requested medical evidence." *Garcia v. Salvation Army*, 918 F.3d 997, 1010 (9th Cir. 2019) (cleaned up). *See also Allen v. Pac. Bell*, 348 F.3d 1113, 1116 (9th Cir. 2003) ("Because Allen failed to cooperate in the job-search process [by failing to appear for required tests to qualify for certain jobs], we cannot say that Pacific Bell failed to fulfill its interactive duty."); *Reza v. Int'l Game Tech.*, 351 F. App'x 188, 190 n.2 (9th Cir. 2009) ("[A]s Reza failed to provide medical evidence supporting her new 'smells' condition, IGT was not required to engage in further interactive processes, and Reza was not entitled to accommodation under the ADA."); *Hill v. City of Phoenix*, 162 F. Supp. 3d 918, 928 (D. Ariz. 2016), *order clarified*, 2016 WL 3457895 (D. Ariz. 2016) ("An employer is not subject to liability on this theory, however, if the employee was responsible for the breakdown in the process.").[28]

No reasonable juror could conclude on this record that CBI failed to reasonably accommodate Plaintiff. To be sure, Plaintiff took many steps that could be viewed as triggering CBI's obligation to engage in an interactive process, including identifying her impairments to CBI employees via email (Doc. 44 at 24, 33), requesting medical leave (Doc. 43-11 at 2; Doc. 62-1 at 14), and submitting a reasonable accommodation request (Doc. 44 at 38-39). But in response, CBI made numerous overtures to Plaintiff, including granting her MLOA and PLOA (Doc. 43-7 at 2; Doc. 43-8 at 2); repeatedly asking her to

---

[28] Alternatively, even if the employer bears responsibility for the breakdown of the interactive process, this does not necessarily result in liability. "[T]here exists no stand-alone claim for failing to engage in the interactive process"—rather, "if an employer fails to engage in good faith in the interactive process," the consequence is simply that "the burden at the summary-judgment phase shifts to the employer to prove the unavailability of a reasonable accommodation." *Snapp*, 889 F.3d at 1095.

fill out a reasonable accommodation application (Doc. 44 at 36 [November 25, 2020 email from Metcalf]; *id.* at 35 [December 2, 2020 follow-up email from Metcalf]; *id.* [December 10, 2020 follow-up email from Metcalf]); repeatedly asking her to provide medical documentation (Doc. 44 at 36 [November 25, 2020 email from Metcalf requesting that Plaintiff's "physician fill out the medical inquiry form for a reasonable accommodation"]; Doc. 62-1 at 25-26 [December 10, 2020 email from Metcalf to Plaintiff requesting medical documentation]; *id.* at 37-38 [January 7, 2021 email from Metcalf to Plaintiff requesting medical documentation]); and repeatedly attempting to set up meetings with her to discuss her situation (Doc. 62-1 at 33-34 [December 17, 2020 communications between Metcalf and Plaintiff to set up a meeting]; *id.* at 32-33 [December 18, 2020 email from Metcalf following up about setting a time for the meeting]; *id.* at 32 [December 28, 2020 email from Metcalf following up]).  Plaintiff, in turn, failed to meaningfully respond to those requests, causing the breakdown in the interactive process.

Although Plaintiff submitted doctors' notes excusing her from work, those generic notes were not responsive to CBI's requests for medical documentation because they did not describe Plaintiff's disabilities or provide a diagnosis.  (Doc. 43-9 at 2-3; Doc. 44 at 32, 37; Doc. 62-1 at 37-38.)   Indeed, Plaintiff maintained that she was not required to provide additional medical information to CBI: "I have enough to deal with and I'm unsure why you keep harassing me during my medical leave regarding petty paperwork that is not a legal requirement."  (Doc. 62-1 at 25.)[29]  Plaintiff also declined to grant CBI access to her medical records.  (Doc. 44 at 39.)   Given this backdrop, no reasonable juror could conclude that CBI was responsible for the breakdown in the interactive process.  *See, e.g.*, *Heit*, 726 F. App'x at 649-50 ("The record establishes that Aerotek did not accommodate Heit's request for alternative drug testing because it did not have the requisite documentation to determine what kind of testing would be appropriate.  An employer has

---

[29]     In her response brief, Plaintiff continues to baselessly criticize CBI for requesting medical documentation as part of the interactive process: "The communication by CBI became so bothersome to disclose personal health information . . . that Plaintiff decided to hire [an] employment law attorney . . . on January 8, 2021 for limited scope representation."  (Doc. 65 at 5.)

a right to this documentation under both the ADA and the WLAD.  Because Heit was responsible for the breakdown of the interactive process, the district court properly granted summary judgment in favor of Aerotek.") (internal citations omitted); *Marquez v. Glendale Union High Sch. Dist.*, 2018 WL 4899603, *20 (D. Ariz. 2018) (concluding that the employer did not have a duty to provide a reasonable accommodation where the employee's "communications with the [employer] were devoid of any detail relating to her condition and need for accommodation or leave" and the employee did not provide any medical records); *Hoang v. Wells Fargo Bank, N.A.*, 724 F. Supp. 2d 1094, 1102 (D. Or. 2010) ("On December 3, after MetLife denied Hoang's application for STD, Wells Fargo sent Hoang a request for a medical certification and warned her of the consequences of not responding.  Wells Fargo wrote to Hoang again on December 22 to inform her that the company had not yet received her paperwork.  Hoang's failure to return the requisite documentation to process her time in Mexico as medical leave indicates that the breakdown in communication rested on Hoang's shoulders.").  *See also Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996) ("[W]here, as here, the employer makes multiple attempts to acquire the needed information, it is the employee who appears not to have made reasonable efforts.").

Finally, separate and apart from the breakdown in the interactive process, no reasonable juror could find on this record that Plaintiff's requested accommodation was reasonable.  Unfortunately, Plaintiff's briefing and reasonable accommodation application are not a model of clarity as to the specific accommodation she believes should have been provided to her.  Although it is clear that Plaintiff requested a medical leave of absence in November 2020 (Doc. 62-1 at 14; Doc. 43-11 at 2), Plaintiff did not indicate what specific accommodation she desired in her reasonable accommodation application, instead stating that "[a]t this time my PCP does not release me to return to work" (Doc. 44 at 38).  When asked to indicate the duration of the reasonable accommodation, Plaintiff wrote "unknown."  (*Id.* at 40.)  As the Ninth Circuit and other courts have recognized, although "[j]ob-protected leave for a fixed period can be an accommodation, . . . indefinite leave is

not reasonable as a matter of law." *Makor v. Burlington N. Santa Fe Ry. Co.*, 680 F. App'x 542, 544 (9th Cir. 2017) (analyzing claim under California's Fair Employment and Housing Act).  *See also Chandler v. DeJoy*, 2024 WL 359469, *15 (D. Ariz. 2024) (collecting cases).

Accordingly,

**IT IS ORDERED** that CBI's renewed motion for summary judgment (Doc. 62) is **granted**.  The Clerk shall enter judgment accordingly and terminate this action.

Dated this 12th day of March, 2024.

Dominic W. Lanza
United States District Judge